UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                                        :
UNITED STATES OF AMERICA                                 :
                                                        :
            -v-                                          :           23-CR-622 (JMF)
                                                        :
MICHAEL CASTILLERO et al.,                               :           OPINION AND ORDER
                                                        :
                              Defendants.                :
                                                        :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Michael Castillero, Francine Lanaia, and Brian Martinsen are charged with securities fraud, wire fraud, investment advisor fraud, and conspiracy to do the same in connection with an alleged scheme to defraud investors in a group of nine related private funds. *See* ECF No. 1 ("Indictment"), ¶¶ 10-21. In addition, Castillero and Martinsen are charged with obstruction of justice and conspiracy to do the same. *See id.* ¶¶ 22-27. In advance of trial, which is scheduled to begin today, Defendants filed motions seeking a severance and a hearing regarding the Government's purported breaches of their attorney-client privilege. *See* ECF Nos. 91, 92, 94. These motions were triggered by disclosure of the notes of interviews that the Government conducted with Castillero in connection with his effort, since aborted, to cooperate. By bottom-line order issued September 2, 2025, the Court denied Defendants' motions for reasons to be set forth in an opinion to follow. ECF No. 111. This is that opinion.

## BACKGROUND

### A. The Alleged Fraud

According to the Indictment, from 2017 to April 2022, the three Defendants engaged in a wide-ranging scheme to defraud investors while selling them securities. Indictment ¶¶ 1, 4, 7.

The Indictment alleges that Defendants conducted this scheme through several entities, including StraightPath Venture Partners LLC ("SPVP"), which was the manager of nine funds, known as the "StraightPath Funds." *Id.* ¶ 4. The Indictment alleges that the three founded and jointly controlled SPVP; the Funds themselves; and StraightPath Management LLC ("SP Adviser"), which was the investment adviser to each of the StraightPath Funds (together, "StraightPath"). *Id.* ¶¶ 4, 8. According to the Indictment, the Defendants and their agents solicited investments into the StraightPath Funds of approximately $386 million from at least 2,000 investors over the course of about five years. *Id.* ¶ 7. The Indictment further alleges that, although Defendants communicated to investors that they earned no fees on the transactions, approximately thirty percent of the capital contributions the StraightPath Funds received from investors, or over $74 million in investors' funds, were actually diverted to pay Defendants and their associates. *Id.* The Indictment also alleges that Defendants were able to accumulate those fees by arbitrarily inflating the prices of shares that they sold to investors. *Id.* ¶ 2. Finally, the Indictment alleges that Defendants concealed the involvement of Lanaia and Castillero at StraightPath because they were barred from the securities industry by the Financial Industry Regulatory Authority ("FINRA") and that they used various artifices to convince investors that another person — "Fund Manager-1" — was actually at the helm of StraightPath. *Id.* ¶¶ 2-6.

**B. The Alleged Obstruction**

In 2018, the U.S. Securities and Exchange Commission ("SEC") sent StraightPath a letter advising that it was conducting an examination of StraightPath and requesting documents and information. *See* ECF No. 98-6, at 2; Indictment ¶ 9(a). Around the same time that the SEC began looking into the company, StraightPath engaged the law firm Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") to represent the company in connection with certain

"regulatory inquiries."  ECF No. 92-4, at 1.  Also at around the same time, Martinsen was called

on to testify before FINRA about StraightPath and his role at StraightPath.  Indictment ¶ 9(b).

On the same day that Nelson Mullins sent an engagement letter to StraightPath, it also sent an

individual engagement letter to Martinsen, similarly agreeing to represent him in connection with

"certain regulatory inquiries."  ECF No. 92-3, at 1.  Both Nelson Mullins engagement letters

were executed by the same attorney: Scott Sherman.  ECF No. 92-3, at 3; ECF No. 92-4, at 4.

In early 2021, the SEC opened a more formal investigation into StraightPath.  Indictment

¶ 9(c).  As part of the investigation, the SEC served subpoenas on StraightPath seeking

documents and records.  *Id.* ¶¶ 25-27.  Martinsen sent a first letter in response to the subpoenas

on May 21, 2021.  ECF No. 98-1.  In the letter, he wrote that emails the SEC had sought through

the subpoenas no longer existed.  *Id.* at 1.  On October 12, 2021, soon after StraightPath once

again retained Nelson Mullins to represent it in connection with the SEC investigation, ECF No.

98-6, at 3, StraightPath sent another letter to the SEC, this time composed by Nelson Mullins.

The second letter explained that the fallout from a hacking incident had made it impossible for

StaightPath to access any emails from earlier than June 3, 2021.  ECF No. 98-2.  The SEC then

subpoenaed Defendants individually, ECF No. 98-6, at 4-5, and, on November 4, 2021, Nelson

Mullins sent a joint engagement letter to all three Defendants and to Lachow, agreeing to

represent them in connection with the formal SEC investigation.  ECF No. 92-5.  Soon after, the

law firm Cahill Gordon & Reindell LLP ("Cahill") joined Nelson Mullins as cocounsel in the

engagement.  ECF No. 98-6, at 1.  Subsequently, the two firms sent two more letters to the SEC

concerning the same emails.  The first, on December 2, 2021, stated that access to some of the

disabled emails had been regained.  ECF No. 98-6, at 4.  The second, on January 11, 2022,

described the purported hacking incident in more detail.  ECF No. 98-7.

According to the Government, all four letters to the SEC were false or, at best, misleading.  Although there was a hacking incident at StraightPath, the Government maintains, it did not prevent Defendants from providing the SEC with the requested emails.  *See* Govt. Mem. 38.  Instead, after receiving the SEC subpoena, Martinsen and Castillero purportedly decided to delete the emails in question to prevent the SEC from obtaining them.  Govt. Mem. 29; Indictment ¶¶ 22-27.  Additionally, according to the Government, Nelson Mullins and Cahill were either complicit in or, at least, aware of Defendants' attempts to prevent the SEC from obtaining the emails by destroying them, and they were also aware that the letters they drafted to the SEC were false or misleading.  ECF No. 98 ("Govt. Mem."), 41-42.

On May 13, 2022, the SEC investigation culminated in a civil enforcement action filed by the SEC against Defendants and others allegedly involved in the scheme.  *See Sec. & Exch. Comm'n v. Castillero et al.*, No. 22-CV-3897 (LAK), ECF No. 1.  During the civil litigation, the court appointed a Receiver for the StraightPath Funds.  22-CV-3897, ECF No. 55.  Five months after the commencement of the civil action, the U.S. Attorney's Office intervened and successfully sought a stay of the civil action pending its criminal investigation.  22-CV-3897, ECF No. 102.

## C.  The Proffers

On November 28, 2023, a grand jury returned the Indictment in this case.  Beginning a little over one year later, Castillero participated in a series of proffer sessions with the Government in an attempt to cooperate.  ECF Nos. 92-2, 95-1.  The proffer sessions were memorialized in thorough notes by the Government.  During the proffer sessions, Castillero extensively discussed the alleged fraud scheme and his own involvement in it, as well as Martinsen's and Lanaia's roles.  Govt. Mem. 34-35.  Castillero also discussed the deletion of

emails subpoenaed by the SEC, Martinsen's knowledge of those deletions, and conversations with Nelson Mullins and Cahill regarding the email deletions that preceded the allegedly misleading letters to the SEC. *Id.* at 35. In all, Castillero proffered six times between January 30, 2025, and February 11, 2025. *Id.* at 34-35.

On the same day as Castillero's penultimate proffer, on February 10, 2025, Castillero's former attorney also provided the Government with an attorney proffer regarding the email deletions. *Id.* at 34. In that proffer, Castillero's counsel described conversations between Castillero and his former attorneys as well as the drafting of the October 12, 2021 letter to the SEC. *Id.* Castillero's attorney also opined that any communications Castillero had with his attorneys at that time were not privileged. *Id.* After his former attorney's proffer — during which his counsel previewed what Castillero would say about the drafting of and accuracy of the October 12, 2021 letter to the SEC — Castillero proffered on the same subject and confirmed the substance of his attorney's account. *Id.* at 35.

**D. Procedural History**

The Government ultimately offered Castillero a cooperation agreement, but he decided not to take it and to proceed — with new counsel — to trial. On May 23, 2025, the Government disclosed the notes of Castillero's proffer sessions to Defendants. ECF No. 80. A week later, Defendants filed a letter indicating that they intended to move for severance. *Id.* One month later, after a briefing schedule was set by the Court, ECF No. 83, Defendants moved to sever their cases. ECF Nos. 91, 92, 94. In addition, Lanaia moved for a hearing with respect to the Government's alleged breaches of attorney-client privilege. ECF No. 90. On August 26, 2025, the Court held oral argument on Defendants' motions. *See* ECF No. 102. On September 2, 2025, the Court denied Defendants' motions by bottom-line order. ECF No. 111.

**DISCUSSION**

As noted, Defendants sought two forms of relief in their motions.  First, all three sought to sever Castillero's case from the others.  Second, Lanaia sought a hearing to examine purported the Government's alleged breaches of attorney-client privilege during Castillero's proffer sessions.  The Court will address each request in turn.

**A.  Severance**

Rule 8(b) of the Federal Rules of Criminal Procedure allows the Government to charge multiple defendants who allegedly "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense" in a single indictment.  "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  The preference is "particularly strong" where "the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).  The standard a criminal defendant must meet "to justify the tremendous burdens separate trials create for the criminal justice system" is thus an "imposing one[]." *United States v. Jimenez*, 824 F. Supp. 351, 367 (S.D.N.Y. 1993).  In order to prevail on a motion to sever, a defendant must show that a joint trial would result in "not simply some prejudice but *substantial* prejudice." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quoting *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980)).  Even in cases with a "high risk of prejudice," "less drastic" measures than severance, "such as limiting instructions, often will suffice" and render severance unnecessary. *United States v. Shkreli*, 260 F. Supp. 3d 247, 253 (E.D.N.Y. 2017) (quoting *Zafiro*, 506 U.S. at 539).

Defendants' principal argument for a severance relied on the Supreme Court's decision in *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny.  They also argued that their cases

should be severed because of mutually antagonistic defenses and because Castillero's codefendants would suffer prejudice from introduction of his statements about his own beliefs regarding StraightPath's fiduciary duties and the sufficiency of its disclosures to its customers. None of these arguments justified a severance. The Court will begin with a discussion of *Bruton*.

### 1. Defendants' *Bruton* Arguments

In *Bruton*, the Supreme Court held that when a non-testifying co-defendant's statements specifically inculpating the defendant are introduced at a joint trial, limiting instructions are not "an adequate substitute for [the defendant's] constitutional right to cross-examination." 391 U.S. at 135-37. The Supreme Court later held, however, that no such concern exists if the non-testifying co-defendant's statements are admitted with a proper limiting instruction and when they are "redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Thus, where the Government seeks to admit a non-testifying defendant's statements in a multi-defendant trial, "courts generally have three options: (1) careful redaction of the out-of-court statement such that all references to the co-defendant are eliminated; (2) severance; or (3) exclusion of the statement at the joint trial." *United States v. Amirov*, No. S8 22-CR-438 (CM), 2025 WL 660197, at *9 (S.D.N.Y. Feb. 28, 2025) (citing *United States v. Jass*, 569 F.3d 47, 56 n.5 (2d Cir. 2009)). To properly redact — or *Bruton*-ize — a statement that would otherwise pose a *Bruton* problem, a statement must be altered such that "the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names." *Jass*, 569 F.3d at 56.

This case does not present an intractable *Bruton* problem. First, the Government opposed severance on the premise that any statements it is likely to introduce could be properly *Bruton*-ized. The Court can and will hold the Government to that representation. That is, if the

Government wishes to introduce a statement at trial and it cannot *Bruton*-ize the statement to the Court's satisfaction, the Court will simply preclude the Government from using the statement. The Government had the option of "br[inging] [the Defendants] to trial on [] separate indictment[s] or [seeking] a severance prior to the commencement of trial." *United States v. Payden*, 622 F. Supp. 915, 922 (S.D.N.Y. 1985). Having made its choice, if it turns out that the Government cannot adequately redact statements that are necessary to its case, it will have no one to blame but itself; it "should have used more foresight" in choosing its path. *Id.*

Martinsen and Lanaia argued that difficult issues will arise even if the Government is able to adequately *Bruton*-ize Castillero's statements because *any* introduction of Castillero's statements would lead them to seek to introduce other statements either as impeachment, *see* Fed. R. Evid. 806, or under the rule of completeness, *see, e.g.*, *United States v. Ramsey*, No. 23-7211-CR, 2024 WL 5199288, at *2 (2d Cir. Dec. 23, 2024) (summary order). But any such effort would fail. If the Government admits Castillero's proffer statements against him, the Court will give a limiting instruction to the jury that Castillero's statements may not be considered against his co-defendants. It follows that any impeachment or contextualization of Castillero's statements by *Martinsen* or *Lanaia* would not be relevant, *see* Fed. R. Evid. 401, 402, and any probative value of such evidence would be substantially outweighed by the risk of jury confusion, *see* Fed. R. Evid. 403; *see also e.g.*, *United States v. Regan*, 103 F.3d 1072, 1083 (2d Cir. 1997) (holding that where a witness's credibility is "irrelevant to the issues before the jury," a court may "properly exclude[] evidence impeaching them"). In other words, Martinsen and Lanaia would not be entitled to introduce Castillero's proffer statements in response to the Government's introduction of properly *Bruton*-ized statements.

That would be the end of the matter except that Lanaia contends that she is entitled to introduce some of Castillero's statements in her own right. ECF No. 91 ("Lanaia Mem"), at 10. If so, and if such statements implicated Martinsen, a severance might well be necessary. That is because precluding Lanaia from offering the statements — if admissible — might violate *her* right "to introduce relevant, exculpatory evidence" in her defense. *Lyons v. Johnson*, 912 F. Supp. 679, 682 (S.D.N.Y. 1996); *see Zafiro*, 506 U.S. at 539 (stating that "a defendant might suffer prejudice" warranting severance "if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial"). Yet allowing Lanaia to introduce a statement by Castillero that inculpates Martinsen, if Castillero exercises his right not to testify, would violate Martinsen's right to confront the witnesses against him. As Defendants conceded at oral argument, however, this triangulation issue arises only if there are statements that are both admissible by Lanaia *and* impossible to *Bruton*-ize as to Martinsen. *See* Oral Arg. Tr. 17-18. As it turns out, that appears to be a null set, so this triangulation problem is unlikely to arise.

For starters, many of the statements Lanaia hopes to introduce do not present any *Bruton* issues at all because they do not inculpate Martinsen (or, for that matter, Lanaia). That is the case for Statements 1, 7-10, 12, and 14-18 in the Chart attached as Exhibit 1 to this Opinion, which lists all of Castillero's statements that Lanaia indicated she "might seek to introduce at trial that might raise a *Bruton* issue." ECF No. 102, at 2. The rest of the statements — Statements 2-6, 11, and 13 — arguably implicate Martinsen, but they are not likely to be admissible. As set forth in the Chart, Lanaia offers the same two arguments for admissibility for all of these statements: Rule 804(b)(3) of the Federal Rules of Evidence, which provides that certain statements against a declarant's penal interest are not hearsay, and Rule 807, the "residual exception." But neither Rule is likely to support admissibility of the statements at trial.

First, for a statement that would otherwise be hearsay to be admissible as a statement against interest, it must have a "tendency to . . . expose [the defendant] to civil or criminal liability."  Fed. R. Evid. 804(b)(3)(A).  Although "[t]he Rule does not require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution," *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (quoting *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978)), a statement must at least be "probative in a criminal trial" against the declarant for the exception to apply.  *Id.*; *see also United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014).  The Rule "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory."  *Williamson v. United States*, 512 U.S. 594, 600 (1994).  In addition, where a statement is offered in a criminal case in which it tends to expose the declarant to criminal liability, it also must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).  The necessary corroboration must indicate "both the declarant's trustworthiness and the truth of the statement."  *Gupta*, 747 F.3d at 127 (quoting *United States v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999).  "[T]he inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable."  *Id.* (quoting *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir. 1987).

Many of the statements Lanaia identifies were not even arguably against Castillero's penal interest.  For example, the following statement has no implications for Castillero's culpability whatsoever: "Fran was at StraightPath to make sure rules are followed.  Compliance.  She had 35 years experience."  Statement 1.  The same is true for: "Anthony Corino — Brian brought him in, Brian dealt with him.  Not sure if Fran knew he was working there or not." Statement 6.  Neither these statements nor Statements 2, 4-5, 8, and 14-16 on the Chart "tend[ed]

. . . to expose [Castillero] to . . . criminal liability." Fed. R. Evid. 804(b)(3)(A).  And to the extent that any statement on the chart even arguably tended to expose Castillero to criminal liability, Lanaia fails to point to any corroborating circumstances, as required by the Rule.  *See* Fed. R. Evid. 804(b)(3)(B).  That is particularly significant here because any statements by Castillero "about what [Lanaia] said or did are less credible than [even] ordinary hearsay evidence." *Williamson*, 412 U.S. at 600.  "The justification underlying the hearsay exception . . . does not extend to statements concerning the roles of other individuals in the alleged crime, even when combined with self-inculpatory remarks," because there is always the possibility that the declarant "merely sought to exculpate his friends." *United States v. Zapata*, 356 F. Supp. 2d 323, 327-28 (S.D.N.Y. 2005) (quoting *United States v. Marquez*, 462 F.2d 893, 895 (2d Cir. 1972).  At oral argument, Lanaia's counsel conceded that he could not corroborate the statements but insisted that corroboration might materialize in the future.  *See* Oral Arg. Tr. 19-20.  But it is Lanaia who "carries [the] heavy burden" of justifying severance, *United States v. Al Fawwaz*, 67 F. Supp. 3d 581, 584-85 (S.D.N.Y. 2014) (quoting *United States v. Amato*, 15 F.3d s230, 237 (2d Cir. 1994)), and baseless speculation is not enough to carry meet that demanding standard.

For similar reasons, Lanaia is also unlikely to be able to avail herself of the residual exception.  Rule 807 comes into play "very rarely, and only in exceptional circumstances" to allow admission of statements "where no other exception applies." *United States v. Ulbricht*, 858 F.3d 71, 123 (2d Cir. 2017).  A statement is admissible under Rule 807 only if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." *United States v. Morgan*, 385 F.3d 196, 208 (2d Cir. 2004) (internal quotation marks omitted).  In

general, "statement[s] made by a criminal in debriefings to the government pursuant to" — or in anticipation of — "a cooperation agreement" are not "particularly trustworthy." *Ulbricht*, 858 F.3d at 123. In itself, that is enough to defeat Lanaia's argument for admissibility. But nor can she show that Castillero's statements are "the most probative evidence" available on any of the subjects on which he proffered. *See, e.g.*, *Great Lakes Reinsurance (UK) SE v. Herzig*, 673 F. Supp. 3d 432, 458 (S.D.N.Y. 2023) (rejecting reliance on the residual exception because the statement at issue was "not the most probative evidence concerning" the issue); *United States v. Dawkins*, 999 F.3d 767, 791 (2d Cir. 2021) (same). Given that the residual exception is to be "invoked sparingly," *Robinson v. Shapiro*, 646 F.2d 734, 742 (2d Cir. 1981), and Lanaia makes almost no effort to justify its application here, the Court cannot conclude that it is a likely basis for her to introduce any of Castillero's proffer statements.

Finally, even if Lanaia were able to introduce some of Castillero's statements under either Rule 804(b)(3) or 807, the Court concludes that they could be sufficiently *Bruton*-ized to address any prejudice to Martinsen. Lanaia's arguments to the contrary rely on the Second Circuit's decision in *United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014). *See* Lanaia Mem. 8. In *Taylor*, three defendants charged with robbery were arrested and one, Taylor, confessed. At trial, his confession, redacted to address *Bruton*, was introduced against him. But the Second Circuit concluded that the redactions were insufficient to cure the *Bruton* problem for two reasons. First, the redactions made it clear that names had been omitted because they included some names — for example, the name of an unindicted party — but used neutral references for the indicted defendants, resulting in "stilted circumlocutions." *Taylor*, 745 F.3d at 29. Second, it was clear whose names were omitted from the statements because "[t]he unnamed persons correspond[ed] by number (two) and by role to the pair of co-defendants." *Id.* In combination,

12

the "obviously redacted confession[s] . . . point[ed] directly to the defendant[s]" and the "jury could immediately infer, on the evidence of the redacted confession alone, that Taylor had likely named the co-defendants." *Id.*  Lanaia argues that the *Bruton*-izations the Government proposes to Castillero's statements (which are set forth in the Chart attached as Exhibit A) fail *Taylor*'s test.  The redacted statements, she asserts, are "unnatural, suggestive, and conspicuous," Lanaia Mem. 8, and "impl[y] reference to only one or two possible people — the co-defendants at trial Ms. Lanaia and Martinsen," ECF No. 99 ("Lanaia Reply"), at 4.

The Court disagrees.[1]  Assuming *arguendo* that some of the redacted statements are awkwardly phrased enough that a juror might wonder if they had been altered, the statements do not point obviously to Martinsen and Lanaia in the same manner that the statements pointed to the co-defendants in *Taylor*.  For one, the Indictment here charges a complex scheme involving multiple acts of fraud and deception over a five-year stretch — far from the "single criminal act" of a "single robbery of a drug store by four people" in *Taylor*.  *United States v. Lyle*, 919 F.3d 716, 734 (2d Cir. 2019).  Moreover, Castillero's "statements [could] refer[] to *multiple* people — not only one unnamed person to correspond to the one co-defendant." *Id.* at 735.  Take Statement 2 ("Brian would withhold information from Lanaia.  Such as any salesperson that was a problem"), which the Government proposes to change to: "Another person would withhold information from Lanaia such as any salesperson that was a problem."  Contrary to Defendants'

---

[1]    The Supreme Court's decision in *United States v. Samia*, 599 U.S. 635 (2023), casts some doubt on whether *Taylor* remains good law.  *Samia* suggests, first, that any confession that is "redacted to avoid naming [the co-defendant]" and does not contain the equivalent of "an obvious blank or the word 'deleted'" necessarily "satisf[ies] *Bruton*'s rule." *Id.* at 653.  Second, *Samia* seems to say that whether a redaction points obviously to a codefendant is immaterial. *Id.* (stating that *Bruton* does not "provide[] license to flyspeck trial transcripts in search of evidence that could give rise to a collateral inference that the defendant had been named in an altered confession").  Because neither party presses this point, however, *see* ECF Nos. 108, 110, the Court need not decide whether or to what extent *Samia* abrogates *Taylor*.

suggestion, the "other person" in this statement does not point ineluctably to Martinsen; it could refer to Eric Lachow (identified in the Indictment as Fund Manager-1), who was also named in the SEC investigation of StraightPath and its officers, or any number of other people.  Thus, this case does not "present the necessary process-of-elimination problem that left the jury's 'choice of implied identity narrow' as in *Taylor*."  *Lyle*, 919 F.3d at 735.  "For all of these reasons, *Taylor* is inapposite," *id.* at 735, and the Government's proposed alterations of Castillero's statements "satisfy[] *Bruton*'s rule," *Samia*, 599 U.S. at 653.

## 2. Defendants' Other Severance Arguments

Defendants' other arguments for severance can be rejected more quickly.  First, Lanaia argued that severance was warranted because Defendants' arguments are likely to be "mutually antagonistic."  ECF No. 91, at 9.  Defenses are mutually antagonistic if, "accepting [one Defendant's] defense requires that the jury must of necessity convict [another] Defendant."  *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (cleaned up).  But "[m]utually antagonistic defenses are not prejudicial *per se*," and "Rule 14 does not require severance even if prejudice is shown; rather it leaves the tailoring of the relief . . . to the district court's sound discretion."  *Zafiro*, 506 U.S. at 538-39.  Severance is required because of mutually antagonistic defenses "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Id.* at 539.

Defendants' defenses are not mutually antagonistic.  Even if, for example, Castillero argues that his reliance on Lanaia and Martinsen shows that he "had no criminal intent to defraud," accepting his defense does not necessarily "lead to the inference that [Lanaia and Martinsen] had the requisite intent."  *Shkreli*, 260 F. Supp. 3d at 254.  Thus, a jury could acquit

14

Castillero while also acquitting Lanaia and Martinsen by "finding that neither defendant had intent to defraud under the circumstances." *Id.* at 255. Defendants' reliance on *United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. 2017), and *United States v. Nordlicht*, No. 16-CR-640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018), is also misplaced. Those cases stand for the proposition that severance is sometimes warranted when one defendant intends to put forward a defense "that no crime was committed," and another defendant plans to put forward a defense that the first defendant was "guilty as charged" of perpetrating an illegal and fraudulent scheme of which the codefendant was merely a victim. *See, e.g.*, *Shkreli*, 260 F. Supp. 3d at 256-57; *Nordlicht*, 2018 WL 1796542, at *2-3. But those cases present extreme examples; in the ordinary case, "mere 'fingerpointing' does not require severance." *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989); *see, e.g.*, *United States v. Serpoosh*, 919 F.2d 835, 837 (2d Cir. 1990). Were it otherwise, "a virtual ban on multidefendant conspiracy trials would ensue," *United States v. Cardascia*, 951 F.2d 474, 484-85 (2d Cir. 1991); instead, the opposite is true, *see United States v. Monfort*, 603 Fed. App'x 40, 44 (2d Cir. 2015) (summary order) ("We have repeatedly recognized a 'particularly strong' preference for joint trials of defendants charged in the same indictment who stand accused of participating in a common plan or scheme."). No Defendant in this case has represented that the very core of their defense will be the guilt of a codefendant. *See, e.g.*, *Shkreli*, 260 F. Supp. 3d at 257 (stating that the jury would essentially be "hearing the government's case in chief twice, once from the government and then again from" the codefendant). In fact, Castillero has not committed to presenting a defense case at all. *See* ECF No. 96 ("Castillero Mem."), at 7. And neither Lanaia nor Martinsen has made any representation that they intend to argue that Castillero is the one and only guilty party who masterminded a fraudulent scheme. *Shkreli* and *Nordlicht* therefore do not call for a severance.

Finally, severance was not warranted on the ground the Government may seek to introduce Castillero's proffer statements in which he agreed that StraightPath owed a fiduciary duty to its customers and that StraightPath's disclosures to those customers had been insufficient. "It is the duty of the Court to instruct the jury as to the law" and, "if any witness . . . state[s] a legal principle different from any that the Court states, it is the Court's legal instructions that the jury must follow." *United States v. Buyer*, No. 22-CR-397 (RMB), 2023 WL 2368549, at *2 (S.D.N.Y. Mar. 3, 2023). The Court will instruct the jury as to how it should to determine whether a fiduciary duty existed or was breached, and "[w]e normally presume that a jury will follow an instruction." *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987). In other words, the jury may rely on Castillero's statements about his beliefs as evidence of his own allegedly fraudulent intent; it may not rely on them as evidence that StraightPath actually owed a fiduciary duty to its customers or that its disclosures were insufficient. *See, e.g.*, *United States v. Snyder*, 668 F.2d 686, 690 (2d Cir. 1982) (stating that where "[t]he only real question" was whether a defendant acted "with the requisite criminal intent," it was proper to "introduce[] evidence that [the defendant] knew what his fiduciary duties were and consciously violated those duties"). To the extent that Martinsen worries that Castillero's admissions may be understood by the jury to be an acknowledgement of the legal fact that a fiduciary duty existed, "any risk of jury confusion can be easily cured by an instruction about the limited purpose of this opinion testimony." *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 137 (S.D.N.Y. 2015).

## B. Attorney-Client Privilege

In addition to seeking severance, Lanaia and Martinsen also argued that they were entitled to a hearing on whether certain exchanges during Castillero's proffer violated their attorney-client privilege. *See* Lanaia Mem 12; ECF No. 93, at 15. Specifically, during the

proffers, both Castillero and his then lawyer referred to communications with counsel regarding the deletion of certain emails that had been subpoenaed by the SEC and the events that led to the drafting of a series of letters about those emails to the SEC by lawyers at Nelson Mullins and Cahill. Both firms represented StraightPath but also, according to Defendants, individually represented Castillero, Lanaia, Martinsen, and Lachow. By eliciting communications with those firms, Defendants argued, the Government violated their privileges. For the reasons that follow, however, the Court concluded that Defendants were not entitled to a hearing, let alone other relief.

"The attorney-client privilege protects communications (1) between a client and his … attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). Its purpose is to "encourage[] clients to confide in their attorney fully and frankly, free from the apprehension of disclosure." *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943 (2d Cir. 1992). The first, and most obvious, requirement for attorney-client privilege to apply is the relationship of attorney and client. *Mejia*, 655 F.3d at 132; *see also Orbit One Commc'ns, Inc. v. Numerex Corp.*, 255 F.R.D. 98, 104 (S.D.N.Y. 2008) ("[I]t is beyond dispute that no attorney-client privilege arises unless an attorney-client relationship has been established."). Once that relationship is established, the party asserting the privilege must also show that a purportedly privileged communication "relat[es] to the subject matter upon which professional advice is sought," *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989), and that it was "kept confidential," *Mejia*, 655 F.3d at 132. "The burden of establishing the attorney-client privilege, in all its elements, always rests upon the person asserting it." *Schwimmer*, 892 F.2d at 244.

Lanaia's and Martinsen's contention that the proffer notes themselves contain information shielded by the attorney-client privilege fails for multiple reasons. First, for most of the statements (which are set forth in the Chart attached as Exhibit B to this Opinion), Lanaia and Martinsen fail to establish the requisite elements of attorney-client privilege. For one thing, they do not have standing to invoke the StraightPath entities' privileges. *See Sec. & Exch. Comm'n v. StraightPath Venture Partners LLP*, 22-CV-3897 (LAK) (S.D.N.Y.), ECF No. 523, at 5 (concluding that "The Receiver . . . [and not] the Individual Criminal Defendants . . . can determine whether and to what extent to waive applicable privileges"); *see also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985) (stating that former managers of a corporation "may not assert the privilege over the wishes of current managers"). Thus, they must show that Castillero or his counsel revealed information shielded by their *individual* privileges. But, at oral argument, Lanaia conceded that there was no basis on which to conclude that she had an individual privilege relating to communications with Nelson Mullins prior to the joint engagement letter signed in November 2021. *See* Oral Arg. Tr. 52. And although Martinsen asserts that he did have an attorney-client relationship as of December 2019, ECF No. 109-1, he offered no response — in his briefing or at oral argument — to the Government's contention that that representation was unrelated to the matter at issue in the communications Castillero disclosed, *see* Govt Mem. 38-39; Oral Arg. Tr. 54-55; *see also Gustavia Home, LLC v. Hoyer*, 362 F. Supp. 3d 71, 86 (E.D.N.Y. 2019) ("[A] party concedes through silence arguments made by its opponent that it fails to address . . . ." (cleaned up)); *CVS Pharmacy, Inc. v. Press America, Inc.*, 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019) ("[A] party may be deemed to have conceded an argument by failing to address it in its briefing."). For a communication to be privileged, it must "relat[e] to [the] subject matter upon which professional advice [was] sought."

*Schwimmer*, 892 F.2d at 243.  Martinsen's December 2019 engagement letter substantially predated the SEC investigation and subpoenas that were the subject of the purportedly privileged communications.[2]  Lanaia's and Martinsen's arguments with respect to Statements 1-6 on the attached Chart fail for these threshold reasons.

Second, many statements Defendants challenge — namely, Statements 1, 6, 7, and all but the sixth sentence of Statement 9 — do not include the substance of communications by counsel at all, let alone communications that were intended to be kept confidential.  For instance, several of the statements merely describe that a particular conversation with counsel occurred or that a particular topic was discussed — without describing what was said.  The attorney-client privilege, however, "pertains solely to the *substance* of communications"; "[i]t does not preclude inquiry into the subject matter of the communications."  *J.P. Foley & Co. v. Vanderbilt*, 65 F.R.D. 523, 526 (S.D.N.Y. 1974) (emphasis added); *accord BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,* No. 09-CV-9783 (RWS), 2013 WL 2322678, at *11 (S.D.N.Y. May 21, 2013). Castillero's statement that he "had a subsequent conversation with Sam Enzer at Cahill and Scott Sherman about the hack" (Statement 7) therefore did not reveal any privileged communications. *See, e.g.*, *GPA Inc. v. Liggett Grp. Inc.,* No. 94-CV-5735 (AGS), 1995 WL 331796, at *1 (S.D.N.Y. June 5, 1995) ("We may readily reject [the] contention that the privilege protects against any inquiry into the subject matter of a conversation between client and counsel.")  For similar reasons, there was nothing improper in Castillero's sharing what was *not* discussed during a conversation with counsel, as he did in Statement 6: "MC did not tell Sherman that SP

---

[2]    Martinsen does not even try to argue that his December 2019 engagement with Nelson Mullins expanded to include other, unrelated matters.  In any event, any such argument would be hard to reconcile with the fact that he was given another engagement letter in November 2021 that specifically referenced the "formal investigation" by the SEC.  ECF No. 92-5, at 1.

did not have access to emails prior to June 2021. Sherman did not tell MC that Sherman would write that in the letter." Because none of these statements revealed "the substance of communications," Lanaia and Martinsen have no claim that any privilege was breached.

In any event, even assuming *arguendo* that Lanaia or Martinsen could establish that Castillero's statements implicated their individual privilege, the crime-fraud exception — which "strips the privilege from attorney-client communications that were made in furtherance of contemplated or ongoing criminal or fraudulent conduct," *In re Grand Jury Subpoenas Dated Sept. 13, 2023*, 128 F.4th 127, 141 (2d Cir. 2025) (quoting *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994)) — would apply. To establish that the crime-fraud exception applies to a communication, the Government must "demonstrate that there is a factual basis for [1] a showing of probable cause to believe that a fraud or crime has been committed and [2] that the communications in question were in furtherance of the fraud or crime." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). In this context, "probable cause simply means 'more probable than not.'" *United States v. Schlesinger*, No. 02-CR-485 (ADS), 2005 WL 8158206, at *4 (E.D.N.Y. Apr. 8, 2005) (quoting *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir. 1983)). The communication in question must be "itself in furtherance of the crime or fraud"; it cannot just "provide . . . evidence of a crime or fraud." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). A communication is in furtherance of a crime if is "intended . . . to facilitate or conceal . . . criminal activity." *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986). It does not negate the exception "if the attorney is unaware that his advice is sought in furtherance of such an improper purpose." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984). Instead, "[t]he client's intention in communicating with counsel is controlling." *In re Richard Roe*, 68 F.3d at 40.

Here, the Government plainly meets the first requirement because "[a]n indictment issued by a grand jury supports a finding of probable cause that a crime or fraud has been committed." *United States v. Costanzo*, No. 22-CR-281 (JPO), 2024 WL 2046053, at *3 (S.D.N.Y. May 8, 2024); *see also Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975) (holding that a grand jury's return of an indictment "conclusively determines the existence of probable cause"). It also meets the second requirement. For one thing, the alleged obstruction charged in the Indictment was "ongoing" at the time the relevant communications occurred. According to the Government, Defendants' "scheme to obstruct" encompassed actions Martinsen and Castillero took to conceal the true ownership of the StraightPath entities from the SEC in late 2018, false testimony Martinsen gave before FINRA in late 2019, the deletion of emails that were responsive to an SEC subpoena in mid-2021, and several materially false or misleading emails sent by Defendants' civil counsel to the SEC in late 2021 and early 2022. *See* Indictment ¶¶ 9, 22-27; Govt. Mem. 29-32, 41-42. And there is probable cause to believe that several of the communications Castillero described were in furtherance of that obstruction. Most prominently, Castillero alleged that Defendants' civil counsel directly instructed them to delete emails subpoenaed by the SEC: "As to the referral agent email deletions, Brian told him to delete the emails and said that Scott said that they shouldn't have emails, so just delete them." Statement 4. The crime-fraud exception plainly applies to communications related to the "willful, systematic and extensive destruction of documents that had been subpoenaed." *Zimmerman v. Poly Prep Country Day Sch.*, No. 9-CV-4586 (FB), 2012 WL 2049493, at *17 (E.D.N.Y. June 6, 2012) (cleaned up).

There is also probable cause to believe that later communications with Defendants' civil counsel about the deleted emails — referenced in Statements 2, 4-5, and 8-10 — were in

furtherance of the obstruction.  That is especially so because, according to the Government, those conversations occurred at or about the time counsel sent false or misleading letters to the SEC about Defendants' access to the subpoenaed emails.  *See, e.g.*, *Doe v. United States*, 82 Fed. App'x 250, 252 (2d Cir. 2003) (summary order) (stating that a client that communicates materially false information to counsel and "intends that [their counsel] convey the [falsity] to the government" makes the communication "in furtherance of [] obstruction").  Nor is the Court persuaded by Martinsen's argument that, because some communications occurred *after* Defendants' civil counsel had already sent an initial, October 2021 letter to the SEC, ECF No. 98-2, they could not have been in furtherance of the alleged obstruction, *see* ECF No. 101 ("Martinsen Reply"), at 8-9.  The communications at issue preceded two additional letters to the SEC — in December 2021 and January 2022 — that, at best, appear to contain materially misleading information about a hacking incident and its effect on the subpoenaed emails.  *See* Govt Mem. 31-32, 41-42; ECF No. 98-5, at 4; ECF No. 98-6.  In any event, the crime-fraud exception applies to communications intended to "facilitate *or to conceal*" criminal conduct.  *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d at 34 (emphasis added); *see also Duttle v. Bandler & Kass*, 127 F.R.D. 46, 54 (S.D.N.Y. 1989) (stating that where "actions [are] taken . . . [to] further[] the cover-up" of securities fraud, "related communications are not privileged").  Whether those later communications facilitated ongoing obstruction or merely concealed obstruction that had already occurred (in the initial deletion or in the first letter to the SEC), there is probable cause to believe that they were "in furtherance of" a crime.  *See, e.g.*, *In re Search Warrant Dated Nov. 3, 2021*, No. 24-192, 2024 WL 3507596, at *5 (2d Cir. July 23, 2024) (summary order) (affirming the district court's application of the crime-fraud exception to documents that "demonstrated an effort to conceal [a] criminal conspiracy or to create or present

misleading or false evidence"); *Specialty Mins., Inc. v. Pleuss-Stauffer AG*, No. 98-CV-7775 (VM) (MHD), 2004 WL 42280, at *9 (S.D.N.Y. Jan. 7, 2004) (stating that an application that sought to "conceal [a] fraud by not disclosing" omissions in an earlier application was subject to the crime-fraud exception).

Finally, and in any event, even if Lanaia or Martinsen had established that Castillero or his former lawyer revealed communications protected by their privileges, they were not entitled to a hearing. Notably, Defendants motion was silent as to the relevant legal standard for whether or when a hearing is required. The Government, meanwhile, cited the standard that applies where an alleged breach of the attorney-client privilege involves a potential violation of the Sixth Amendment. *See* Govt. Mem 28-29. Under that standard, to obtain a hearing, "a defendant must allege specific facts that indicate communication of privileged information to the prosecutor *and* prejudice resulting therefrom." *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985) (emphasis added). But the alleged intrusion on the attorney-client privilege here did not implicate the Sixth Amendment because it pertained to Defendants' communications with *civil* counsel in connection with an SEC investigation. *See, e.g.*, *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742 (1984) (holding that the Sixth Amendment is not implicated by an SEC investigation); *S.E.C. v. Ahmed*, 72 F.4th 379, 395 (2d Cir. 2023) ("Ahmed has no constitutional right to counsel in this civil enforcement action"); *United States v. Adams*, No. 017-CR-00064 (DWF) (KMM), 2018 WL 6991106, at *17 (D. Minn. Sept. 17, 2018) (rejecting the argument that "the existence of an SEC investigation . . . triggered [the defendant's] Sixth Amendment right to counsel"). It stands to reason, therefore, that, to be entitled to a hearing, Lanaia and Martinsen would have to make an even stronger showing than the Government contends.

The Court need not and does not decide whether an even stricter standard should apply because, even if the Sixth Amendment standard does apply, Lanaia and Martinsen failed to meet it.  Indeed, they made no attempt whatsoever to show that they suffered any prejudice from Castillero's statements.  *See, e.g.*, *United States v. Salvagno*, 306 F. Supp. 2d 258, 272 (N.D.N.Y. 2004) ("[T]he court denies defendants' motion requesting an order directing an evidentiary hearing . . . [because d]efendants have failed to allege specific facts that indicate communication of privileged information to the Government and prejudice resulting therefrom.").  Instead, at oral argument, Lanaia maintained that she was entitled to a hearing even if she could not establish prejudice because "she had no insight into what the government ha[d] done with [any] information" that it improperly obtained.  Oral Argument 57 ("Maybe there wasn't prejudice we don't know that yet."); *id.* at 58 ("I agree, it's possible there is not prejudice.").  That is not sufficient.  *See United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) (stating that where the defendants did not establish that a cooperator "revealed any privileged information to the government," the defendants' "statement that [they] had no way of knowing the extent of any prejudice [they] might have suffered . . . was insufficient to require a hearing").  Nor is Martinsen's conclusory assertion in his reply brief that the introduction of any privileged statements "would clearly prejudice [him] at a joint trial."  *See* Martinsen Reply 10; *see also, e.g.*, *Aulicino*, 44 F.3d at 1117 (stating that the defendants' "speculation that they may well have been severely prejudiced . . . was insufficient to require a hearing" (cleaned up)).  "A hearing may not be granted simply because a defendant assumes that he was prejudiced by" a purported breach of privilege.  *United States v. Bin Laden*, No. S7 98-CR-1023 (KTD), 2005 WL 287404, at *6 (S.D.N.Y. Feb. 7, 2005), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).  Especially here, where Defendants "cite no

case discussing the court's *obligation* to hold a hearing in a criminal trial premised upon a cooperating co-defendant's alleged violation of a joint defense agreement," *Salvagno*, 306 F. Supp. 2d at 271, Defendants "did not present any evidence to suggest that [Castillero] revealed any privileged information to the government," *Aulicino*, 44 F.3d at 1117, Defendants "cannot show how [they were] prejudiced by the Government's purported use of" any purportedly privileged information, *Bin Laden*, 2005 WL 287404, at *6, and Defendants "cannot [even] claim a violation of [their] Sixth Amendment right[s]," *Baltas v. Dones*, No. 3:22-CV-38 (MPS), 2022 WL 1239989, at *10 (D. Conn. Apr. 27, 2022), no hearing was warranted.

## CONCLUSION

For the foregoing reasons, Defendants' motions were DENIED.


SO ORDERED.

Dated:  October 20, 2025
        New York, New York

_____
JESSE M. FURMAN
United States District Judge

EXHIBIT A

| Statement No. | Statement | Lanaia's Proffered Basis for Admissibility | Government's *Bruton* Response |
|---|---|---|---|
| (1) | Fran was at StraightPath to make sure rules are followed. Compliance. She had 35 years experience | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | No *Bruton* issue |
| (2) | Brian would withhold information from Lanaia. Such as any salesperson that was a problem | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | Another person would withhold information from Lanaia such as any salesperson that was a problem |
| (3) | Fran did not want anyone who had been in trouble with FINRA to be a salesperson. Every salesperson that Brian brought was pretty much a barred FINRA guy, which Fran did not want. Brian would tell MC not to tell Fran. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | Fran did not want anyone who had been in trouble with FINRA to be a salesperson. Every salesperson that another person brought was pretty much a barred FINRA guy, which Fran did not want. That person would tell MC not to tell Fran. |
| (4) | Brian would tell Fran to send out referral agreements in the name of the person's LLC rather than their real names because Fran would check. Once he had the guy's wife's name put on it instead; can't remember the guy's name or the wife's name. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | A person would tell Fran to send out referral agreements in the name of the person's LLC rather than their real names because Fran would check. Once that person had the guy's wife's name put on it instead; can't remember the guy's name or the wife's name. |
| (5) | One of the guys Fran really hated was named Harry. She found out that Brian had brought him in or was thinking of bringing him in and called MC to yell at him. Said he wasn't a good guy; said he got in trouble with FINRA and SEC, and she never liked him. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | One of the guys Fran really hated was named Harry. She found out that someone had brought him in or was thinking of bringing him in and called MC to yell at him. Said Harry wasn't a good guy; said he got in trouble with FINRA and SEC, and she never liked him. |
| (6) | Anthony Corino – Brian brought him in, Brian dealt with him. Not sure if Fran knew he was working there or not. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | Anthony Corino – another person brought him in and dealt with him. Not sure if Fran knew he was working there or not. |
| (7) | Castillero was primarily responsible for onboarding sales agents, more than Brian. Fran would send the referral agreement out to them. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | No *Bruton* issue |

| Statement No. | Statement | Lanaia's Proffered Basis for Admissibility | Government's *Bruton* Response |
|---|---|---|---|
| (8) | Scott Hollender, Gabe Migliano, L&G guys joined<br>- Fran checked Gabe out before she onboarded him, but his license may have expired at some point thereafter.<br>- Mario Gugliomello – he had issues on his Series 7, customer disputes<br>Knew Mario from working at Legend Securities; stayed in touch.<br>Then he worked at Warden capital<br>Warden Capital onboarded to be a customer of SP<br>- Steve Lacaj<br>o Met him through Mario | Fed. R. Evid. 804(b)(3)<br>Fed. R. Evid. 807 | No *Bruton* issue |
| (9) | MC understood Fran was running an OFAC on customers to check for accreditation. Another check too, something like customer verify. MC was not running these checks. | Fed. R. Evid. 804(b)(3)<br>Fed. R. Evid. 807 | No *Bruton* issue |
| (10) | MC trained referral agents on overcoming customer objection on the phone, if someone was leery<br>of buying, how to close them. | Fed. R. Evid. 804(b)(3)<br>Fed. R. Evid. 807 | No *Bruton* issue |
| (11) | MC doesn't know if FL ever saw a pitch script. But understood that she believed that as long as the markup is disclosed in the PPM "we are covered."<br>Wasn't discussed that in depth; she didn't know about the pitches Brian was getting. | Fed. R. Evid. 804(b)(3)<br>Fed. R. Evid. 807 | MC doesn't know if FL ever saw a pitch script. But understood that she believed that as long as the markup is disclosed in the PPM "we are covered." Wasn't discussed that in depth; she didn't know about the pitches others was getting. |
| (12) | Fran would tell us to fire him – refers to SH. Fran would have said that Scott lying about his role was a big liability for the company. | Fed. R. Evid. 804(b)(3)<br>Fed. R. Evid. 807 | No *Bruton* issue |
| (13) | Brian was saying that the plan was to claim to the SEC we don't have emails.<br>He was saying that he was going to tell Fran we don't archive emails and she was going to relay that to the SEC. | Fed. R. Evid. 804(b)(3)<br>Fed. R. Evid. 807 | Another person said the plan was to claim to the SEC we don't have emails. That person said they were going to tell Fran we don't archive emails and she was going to relay that to the SEC. |

| Statement No. | Statement | Lanaia's Proffered Basis for Admissibility | Government's *Bruton* Response |
|---|---|---|---|
| (14) | MC's daughter's birthday is May 21. Around that time, Fran called MC to say that she has a call with the SEC lady. Fran asked whether they got CDs from godaddy with the backup of the email account. MC said what do you mean, and Fran said ok bye I'll call you back. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | No *Bruton* issue |
| (15) | Fran was tracking customers, number of investors per fund and number of shares sold. MC would send Fran a fedex at the end of the week with that week's subscriptions. MC would scan into the computer before sent to her. Fran was keeping master spreadsheets of all the investors and documents. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | No *Bruton* issue |
| (16) | MC doesn't recall any specific conversations with FL about price discrimination | Fed. R. Evid. 807 | No *Bruton* issue |
| (17) | In November into December MC started looking into each of the shares sold over the year per holding and a reconciliation on the WL versus the spreadsheets. Then realized they had a Rubrik issue, were short shares of Rubrik. MC started panicking a little bit. Then did the count on every holding. Started finding out that they were short on some holdings, over on others. MC started calling Fran about these reconciliations. MC asked FL to send him her spreadsheet of how much Rubrik sold versus how much bought. She said she would work on it. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | No *Bruton* issue |
| (18) | FL agreed that they were short on Rubrik, thinks there were five they were short on. The three of them wired in 700,000 each to pay for Rubrik shares. In late 2021, early 2022. | Fed. R. Evid. 804(b)(3) Fed. R. Evid. 807 | No *Bruton* issue |

# EXHIBIT B

| Statement No. | Statement | Alleged Privilege Holder |
|---|---|---|
| (1) | MC and Scott Sherman had a conversation about the chain of events. MC told SS what had happened, understood that BM had already looped him in.  MC now feels that the letter to the SEC was misleading because it didn't disclose the May deletions. MC did not tell SS about those May deletions. MC assumes that BM told SS about the May deletions. | StraightPath Venture Partners Brian Martinsen |
| (2) | BM said in that phone call that SS had said that referral agents shouldn't have an email address. So MC believes BM conferred with SS. | StraightPath Venture Partners Brian Martinsen |
| (3) | Scott Sherman called Castillero and went over what it says in the letter regarding the deletions. Essentially read it to him, asked him whether it was correct, Castillero said yes. | StraightPath Venture Partners Brian Martinsen |
| (4) | As to the referral agent email deletions, Brian told him to delete the emails and said that Scott said that they shouldn't have emails, so just delete them. MC doesn't know what Scott and Brian discussed or whether Scott really told Brian that. | StraightPath Venture Partners Brian Martinsen |
| (5) | Scott Sherman called MC and said that he and Brian Martinsen had already discussed the whole chain of events regarding the hacks. And Scott asked MC to retell Scott about deleting the June emails, and what MC had done. MC confirmed that he had deleted the emails because Brian/ Fran Lanaia and told him there was a hack. | StraightPath Venture Partners Brian Martinsen |
| (6) | MC did not tell Sherman that SP did not have access to emails prior to June 2021. Sherman did not tell MC that Sherman would write that in the letter. | StraightPath Venture Partners Brian Martinsen |

| Statement No. | Statement | Alleged Privilege Holder |
|---|---|---|
| (7) | After the letter, had a subsequent conversation with Sam Enzer at Cahill and Scott Sherman about the hack. Approx. late 2021. MC told the truth to the lawyers in this conversation. It was a short conversation. Going into the subsequent conversation, MC believed that Scott Sherman already knew that MC had deliberately deleted emails at BM direction. | StraightPath Venture Partners Brian Martinsen Michael Castillero Francine Lanaia Eric Lachow |
| (8) | Scott said to MC that they wanted to talk about the texts between MC and BM regarding email deletions. MC believed that Sherman already knew. Sherman said Sam wants to know why you guys were texting about deleting emails. MC understood this to be a rhetorical question, felt that it was like his dad calling to yell at him. It was more like a tongue-lashing. MC thinks he didn't answer the question, why did you text about it. | StraightPath Venture Partners Brian Martinsen Michael Castillero Francine Lanaia Eric Lachow |
| (9) | Leading up to call no attorney had told MC we need to correct what was previously said to SEC about the referral agent email accounts. During the call, no attorney told MC we need to correct what was said to SEC. MC did not have an understanding of whether the purpose of the call was to correct what was said to SEC. It was a one or two minute call. Sam did most of the talking, he did the yelling. Sam was fairly new on the case. Sam said he was really upset that he had discovered the text thread between MC and Brian regarding the deletions of the emails, said why would Brian text about deleting emails and having no archives, Sam said he was really upset that he had found this. Ended the call. | StraightPath Venture Partners Brian Martinsen Michael Castillero Francine Lanaia Eric Lachow |

| Statement No. | Statement | Alleged Privilege Holder |
|---|---|---|
| (10) | A few minutes later, MC got a call from Martinsen that Martinsen had also just gotten scolded by Sam about the text messages regarding deleting emails and no archives. BM was justifying putting it in a text message – said the text conversation was about deleting Scott and Gabe emails. BM did not mention in this conversation that Sherman had blessed the deletions at the time, but BM had told MC multiple times that Sherman had said that SP shouldn't have referral agent emails. | StraightPath Venture Partners<br>Brian Martinsen<br>Michael Castillero<br>Francine Lanaia<br>Eric Lachow |
| (11) | Brian had told MC that Scott Sherman had said that it was ok to have Fran working in the back off Eric's email. Later in 2021, is when MC understood that things were getting heavy with SEC. around when Fran brough Sam Enzer in. | StraightPath Venture Partners<br>Brian Martinsen<br>Michael Castillero<br>Francine Lanaia<br>Eric Lachow |