# COVER LETTER & CONSTITUTIONAL NOTICE

**SUBMITTED IN TANDEM WITH THE SWORN AFFIDAVIT OF FACTS IN CASE NO. 1:23-CR-00622-JMF**

**DATE:** July 14, 2026

**TO:**

- **The Chief Justice of the United States**, Supreme Court of the United States
- **The Chief Judge of the Southern District of New York**, Hon. Laura Taylor Swain
- **The Federal Bureau of Investigation (FBI)**, Washington Headquarter Desk
- **The United States Attorney's Office**, Southern District of New York (SDNY)
- **The U.S. Securities and Exchange Commission (SEC)**, Enforcement Division

## NOTICE OF FORMAL ADMINISTRATIVE RECORD SUBMISSION & DUE PROCESS DEFAULT

To Whom It May Concern,

Enclosed please find the formally sworn, notarized, and legally executed **Affidavit of Facts** submitted under penalty of perjury pursuant to 28 U.S.C. § 1746 by **Michael Castillero** (Case No. 1:23-cr-00622-JMF-1). This document, accompanied by certified trial exhibits and formal deposition records, establishes an unyielding administrative and legal record of structural overreach, prosecutorial misconduct, and fatal jurisdictional defaults executed throughout this prosecution.

While this record serves as an evidentiary foundation for active Executive Clemency files (Clemency Case File: P323265) and congressional oversight petitions, the underlying primary-source records demand immediate administrative and judicial scrutiny.

## I. EXPOSING A SENTENCING MISREPRESENTATION: THE MEDIA RECORD

As detailed in Section V of the enclosed Affidavit, the prosecution engaged in severe First Amendment retaliation, dedicating thirteen (13) pages of a post-trial submission (**Document 228**) to tracking and penalizing Mr. Castillero's public appearances. The prosecution utilized these protected public statements to secure a sentencing enhancement based on an alleged "lack of remorse," resulting in an 11-year cumulative sentence—one full year longer than his business partner, Brian Martinsen.

This Office must correct a critical, factually false assertion utilized by the prosecution to justify this disparate sentencing. The prosecution's sentencing memorandum argued that a longer

sentence was warranted because Mr. Castillero publicly defended himself, while his business partner "engaged in no public media defense."

This assertion is flatly contradicted by the record:

- **The Factual Record:** As documented in the government's own Document 228 (Page 12), his partner, Brian Martinsen, did in fact make a public media appearance on *The Case for America* on December 6, 2025, during which he discussed the fund's assets, the actions of the court-appointed receiver, and the underlying pre-IPO stock metrics.
- **The Improper Comparison:** A single, limited appearance by Mr. Martinsen to explain standard financial mechanics does not constitute a coordinated public media campaign, nor does it justify the government's false assertion to the sentencing court that he had entirely abstained from public discourse.
- **The Due Process Violation:** Under the Fifth Amendment, a federal sentence cannot rest on unsupported, incomplete, or materially false factual assertions. The government's deliberate mischaracterization of the partners' respective media activities to manufacture a disparate sentencing enhancement directly violates due process.

## II. EV_IDENTIARY CONTRADICTIONS & PRESERVING THE CONSTITUTIONAL RECORD

The accompanying exhibits dismantle the factual foundation upon which both the civil shutdown and the criminal sentencing were built:

1. **SEC Investigator/Examiner Douglas Smith's Deposition (Exhibit A):** Under cross-examination, the SEC's chief investigator conceded under oath that he did not review any brokerage records, did not calculate investor profits or losses, did not review the Private Placement Memorandums (PPMs) outlining allowable fees, and could not account for how his estimated $14 million "deficit" was completely dwarfed by StraightPath's estimated $200+ million in verified stock assets. This testimony directly, irreconcilably contradicts the "emergency insolvency" premise used to execute an immediate freeze.
2. **Improper Regulatory Classification (Exhibit D):** The sworn trial testimony of Mr. DeBella establishes that StraightPath Management was structured and operated under clear statutory guidelines as an **Exempt Reporting Advisor (ERA)**. The prosecution intentionally ignored this legal architecture to manufacture artificial compliance violations.
3. **The Overturning of Chevron & Jarkesy:** Under the Supreme Court's decisions in *Loper Bright Enterprises v. Raimondo* and *SEC v. Jarkesy*, the SEC's unilateral attempts to bypass Article III jury trials and impose self-serving regulatory expansions over an Exempt Reporting Advisor constitute a severe, non-deferrable abuse of administrative authority.
4. **Absolute Lack of Venue (Exhibit C):** Under the Supreme Court's landmark 9-0 ruling in *Abouammo v. United States*, venue for 18 U.S.C. § 1519 charges is restricted strictly to the geographic district where the physical acts occurred. GoDaddy Administrator Logs (**GX 701-A**) prove that StraightPath's physical administrative footprint, servers, and staff

completely relocated to Jupiter, Florida by early 2021. The Southern District of New York possessed zero geographical venue over these charges as a matter of law.

The enclosed Sworn Affidavit of Facts and backing exhibits are hereby formally served to be placed permanently in the official administrative record.

Respectfully submitted,

**Michael Castillero** Case No. 1:23-cr-00622-JMF-1

Clemency Case File: P323265

Palm City, FL

**Enclosures: * Sworn and Notarized Affidavit of Facts** (Executed July 14, 2026)

- **Exhibit A:** Deposition of SEC Examiner Douglas J. Smith (May 2022)
- **Exhibit B:** Government's 13-Page Media Tracking Filing (Document 228)
- **Exhibit C:** GoDaddy Administrator Log establishing Florida Presence (GX 701-A)
- **Exhibit D:** Trial Transcript of Examiner DeBella confirming ERA Status

# AFFIDAVIT OF FACTS

## (SWORN, NOTARIZED, AND SUBMITTED UNDER OATH)

**TO:**

- **The Chief Justice of the United States**, Supreme Court of the United States
- **The Chief Judge of the Southern District of New York**, Hon. Laura Taylor Swain
- **The Federal Bureau of Investigation (FBI)**, Washington Headquarter Desk
- **The United States Attorney's Office**, Southern District of New York (SDNY)
- **The U.S. Securities and Exchange Commission (SEC)**,

  Enforcement Division

**RE:** *United States v. Castillero, et al.*, Case No. 1:23-cr-00622-JMF (SDNY)

**CLEMENCY CASE FILE:** P323265

**DATE:** July 13, 2026

**STATE OF FLORIDA )**

**COUNTY OF MARTIN ) ss.**

I, Michael Castillero, being first duly sworn, depose and state under penalty of perjury that the following facts are true, accurate, and within my personal knowledge:

## I. PURPOSE OF AFFIDAVIT & DUE PROCESS NOTICE

1. I submit this formal Affidavit of Facts to establish a permanent, primary-source record of structural overreach, prosecutorial misconduct, and fatal jurisdictional errors executed during the investigation, trial, and sentencing phases of this matter.

2. This affidavit stands in tandem with an active Executive Clemency petition and formal oversight files delivered to the United States House Judiciary Subcommittee on the Weaponization of the Federal Government.

3. **Constitutional Mandate on Accusatory Sufficiency:** The government is legally required to disclose the true factual basis for its accusations and alleged misconduct at the time it seeks judicial relief. The government cannot rely on conclusory assertions, nor can federal sentencing rest on unsupported factual assertions or materially false information. Due process under the Fifth Amendment is directly violated if a citizen's liberty and sentencing are structured around unreliable, inaccurate, or intentionally omitted data.

## II. STRUCTURAL SOLVENCY & ILLEGAL REGULATORY CLASSIFICATION

1. **Corporate Asset Baseline:** StraightPath Venture Partners was established as an asset-backed, private equity platform designed to democratize access to high-upside pre-IPO tech stocks (including SpaceX, Palantir, and Airbnb) for ordinary American investors.

2. **Mathematical Solvency:** At the time of the administrative intervention, the firm maintained a baseline of structural solvency and possessed a verified track record of delivering consistent returns to its investor base.

3. **The SEC Evidentiary Contradiction:** The company was abruptly thrust into bankruptcy based on an SEC Emergency Action in *SEC v. Straightpath Venture Partners, LLC*, Case No. 1:22-cv-03897-LAK (S.D.N.Y.). The core foundation of this intervention is structurally flawed, as the initial SEC civil order alleging an unbacked operation stands in direct, irreconcilable contradiction with the subsequent formal deposition testimony of the SEC's own Examiner/Investigator. Under oath, the SEC Examiner conceded critical facts regarding the existence of underlying corporate assets and operational mechanics that completely undermine the "emergency" premise utilized to freeze our bank lines. The state deliberately used this selective, half-fact review to engineer an immediate operational standstill and subsequent liquidation, later pointing to the resulting corporate wreckage as the primary evidence of a criminal act.

4. **Improper Regulatory Classification (The DeBella Testimony):** I declare that the prosecution improperly and falsely charged me under standard investment adviser legal frameworks. As conclusively established under oath by the formal testimony of Mr. DeBella, StraightPath Venture Partners operated under clear statutory guidelines as an **Exempt Reporting Advisor (ERA).** The regulatory and prosecuting entities intentionally ignored this distinct legal architecture, overriding established exemptions to manufacture an artificial compliance violation and overextend their jurisdictional authority to secure an improper conviction.

## III. THE STRUCTURAL ILLEGITIMACY OF SEC ADMINISTRATIVE OVERREACH

1. **The Overturning of *Chevron*:** The SEC operates as an administrative agency and possesses no independent constitutional authority to expand its regulatory

reach or rewrite statutory boundaries to manufacture fraud claims. Pursuant to the Supreme Court of the United States (SCOTUS) landmark ruling in ***Loper Bright Enterprises v. Raimondo***, which definitively overturned the *Chevron* doctrine, federal courts are no longer permitted to defer to an agency's self-serving, ambiguous interpretations of law. The judiciary must exercise independent judgment. The SEC's unilateral decision to ignore our explicit status as an Exempt Reporting Advisor (ERA) constitutes a fatal, non-deferrable abuse of administrative discretion.

2. **The *Jarkesy* Precedent:** Furthermore, under the Supreme Court's ruling in ***SEC v. Jarkesy***, the SEC's reliance on in-house administrative mechanisms and non-Article III frameworks to bypass basic constitutional protections—such as a defendant's absolute right to a jury trial for common law-aligned fraud allegations—has been recognized as an unconstitutional expansion of executive power. The regulatory foundation used to dismantle StraightPath was structurally illegitimate from its inception.

## IV. GOVERNMENT MISCONDUCT: PIERCING THE ATTORNEY-CLIENT PRIVILEGE

1. **Willful Misconduct and the Crime-Fraud Exception:** I declare that the prosecution and investigative agencies engaged in severe, willful misconduct by unlawfully piercing our protected attorney-client privilege during the investigation and trial phases.

2. **Manufactured Justification:** The government intentionally manipulated and inverted the **crime-fraud exception** as an aggressive lawfare weapon. Rather than demonstrating an actual, legitimate threshold of ongoing or planned criminality to pierces privileges, the prosecution utilized fabricated, conclusory assertions to invade core defense communications. This unlawful intrusion into protected legal strategy directly contaminated the adversarial process, violating my fundamental right to effective counsel and a fair trial.

## V. FIRST AMENDMENT RETALIATION & SENTENCING ENHANCEMENT

1. **Protected Public Discourse:** Following the administrative freeze, I exercised my protected rights under the First Amendment of the United States Constitution to publicly defend my family, my business architecture, and our investors on independent media networks, including appearances on *Diamond and Silk*.

2. **The 13-Page Penalty Brief (Document 228):** In a formal post-trial submission, federal prosecutors dedicated thirteen (13) pages to meticulously cataloging, tracking, and profiling my public media appearances.

3. **Speech-Based Sentencing Enhancement:** The prosecution successfully utilized these protected First Amendment appearances to argue a "lack of remorse" to the court. On May 20, 2026, this explicit reliance on my public speech resulted in a cumulative sentence of 11 years—one full year longer than my business partner, who engaged in no public media defense. This direct penalty on speech completely violates the due process standard dictating that sentencing cannot rest on unsupported factual

assertions, vindictive penalties, or materially false characterizations of a defendant exercising a constitutional right.

## VI. GEOGRAPHIC VENUE CONTRADICTION & THE *ABOUAMMO* PRECEDENT

1. **The Trial Venue Instruction:** The Southern District of New York instructed the jury that venue for the 18 U.S.C. § 1519 obstruction charges could be established simply if any electronic communication moved "into or out of" Manhattan.

2. **The Supreme Court Rule:** On June 11, 2026, the Supreme Court of the United States issued its landmark ruling in ***Abouammo v. United States*** (No. 25-5146), holding explicitly that a defendant charged under § 1519 must be tried strictly in the geographic district where the physical act of document alteration or destruction occurred. Venue cannot be manufactured based on the location of the underlying investigation.

3. **Primary Evidence Location:** The prosecution's own trial exhibits—specifically the *GoDaddy Administrator Log (GX 701-A)* and internal corporate correspondence headers—conclusively show that by February and May of 2021, StraightPath's entire administrative footprint, staff, and operations had physically relocated to **Jupiter, Florida**. Because no conduct constituting the alleged offense physically occurred within the Southern District of New York, the prosecution lacked geographic venue as a matter of law, constituting a plain error under current Supreme Court precedent.

## VII. ECONOMIC IMMINENCE AND FAMILY COLLATERAL DAMAGE

1. **Asset Fire Sales:** While a court-appointed receiver continues to execute private, non-disclosed fire sales of pre-IPO tech blocks to fund millions in ongoing hourly bureaucratic overhead, the Department of Justice is aggressively pursuing post-sentencing forfeiture actions.

2. **Family Displacement:** These forfeiture actions are directly targeting my primary family residence in Florida. This standard lawfare tactic threatens to place my wife, Nikki, and our two young children on the street prior to my hard-set voluntary surrender date of September 10, 2026.

## VIII. RECORD PRESERVATION & CONFLICT VERIFICATION

The following primary-source items are preserved, cited, and referenced as the evidentiary basis for this Affidavit:

- **EXHIBIT A:** The formal deposition transcript of the SEC Investigator/Examiner in Case No. 1:22-cv-03897-LAK, standing in direct contradiction to the initial SEC Emergency Orders.
- **EXHIBIT B:** *Document 228 (SDNY File)*, outlining the 13-page First Amendment media tracking matrix.
- **EXHIBIT C:** *Government Exhibit 701-A*, the GoDaddy Administrator Log establishing absolute physical operational presence in Jupiter, Florida.

- **EXHIBIT D:** The formal testimony transcript of Mr. DeBella, establishing StraightPath's operational status as an Exempt Reporting Advisor (ERA) and verifying the regulatory misclassification by the prosecution.

## IX. VERIFICATION & EXECUTION

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements, verified by public docket entries, trial transcripts, and primary financial records in Case No. 1:23-cr-00622-JMF, are true, accurate, and correct to the best of my knowledge, information, and belief.

Executed on this 14 day of July, 2026.

Respectfully submitted,

**Michael Castillero**

Case No. 1:23-cr-00622-JMF-1

Clemency Case File: P323265

*Michael Castillero*

Palm City, FL

**NOTARY ACKNOWLEDGEMENT**

The foregoing instrument was sworn to (or affirmed) and subscribed before me this 14 day of July 2026, by **Michael Castillero**, who is personally known to me or who has produced Florida Driver License as identification.

**Notary Public, State of** New York

My Commission Expires: 12/17/2029

[Seal]

**ANTHONY J NOVELLI**
Notary Public, State of New York
Registration No. 01NO0044862
Qualified in Dutchess County
Commission Expires Dec. 17, 2029

Notarized Online with NotaryLive.com

Notarized by: Anthony J Novelli
Time: 2026-07-14 13:00:55 UTC
URL: https://notarylive.com/tu/cdp/D58MZD
Access ID: D58MZD
Pin: XSDRAQ

# EXHIBIT A

## DOUGLAS SMITH'S SEC TESTIMONY OF MAY 19, 2022

## EXAMINATION DONE BY SCOTT SHERMAN

9 – Smith did not review the SEC's memo of law in support of shutting down StraightPath and appointing a receiver.

11 – Smith is a staff accountant who works on investigations for the SEC Division of Enforcement.

12 – He attended the American Musical and Dramatic Academy after high school and went to Utica College in Syracuse University where he studied criminal justice, economics and crime investigation with financial investigation concentration, graduating in December 2006. In that regard, he took 20 to 30 credit hours worth of accounting.

13 – He became a certified fraud examiner in 2010.

14 – He doesn't specifically recall what type of training he received to become a certified fraud examiner—it was conducted by the Association of Certified Fraud Examiners.

15 – He went to Georgetown Law for a short period to take some LLM classes that the SEC provided to staff.

15 – He began with the SEC in 2007.

16-17 – Before that he worked briefly for the New York Mercantile Exchange and for the Bank of New York.

18 – For the SEC he began with the Office of Compliance Inspections and Examinations as a Securities Compliance Examiner where he did exams of registered investment companies.

18 – This involved going out into the field and meeting with fund advisors. He held this position until 2012 when he became a staff accountant in the Division of Enforcement.

18 – His responsibility involves reviewing records that come in pursuant to subpoenas. These involve bank records, brokerage records, transfer agent record, phone call records, etc.

19 – Essentially, he takes data that comes in and schedules it out as directed by the staff.

17-23 – He describes the two prior unrelated court proceedings that he was prepared to provide testimony in.

23 – He is not a CPA.

23 – The instant Declaration is only the second one he has ever prepared for the SEC.

25 – He was assigned the StraightPath case in July 2021, and began working on it in August 2021.

27-28 – He was assigned the case by Neil Hendleman and Rob DeLeonardis. He created a Declaration dated May 13, 2022 which had ten exhibits.

28-29 – His work focused on a review on a review of all relevant bank records which included looking to see if there were distributions to investors. He did not conduct a review of the brokerage records as he "didn't have enough time, there were about 15,000 rows of bank records and only one person, me doing them so it was a lot of work."

29-30 – He agrees that the brokerage records could show cash or stock going to investors through that individuals brokerage account or bank account or it could show shares going from the brokerage accounts to others.

30 – At the time of the StraightPath matter, he was working on approximately five unrelated other matters at that time.

30 – His review of bank records identified distributions of cash going out to investors.

**30 – But he wasn't able to identify stock going out or cash from brokerage accounts because he didn't have time to review the brokerage account statements.

30-31 – As part of his work he did not take effort to identify any investment returns or profit earned by investors as he didn't have time to review the brokerage statements.

31 – He did not identify any distributions of any asset to any of the StraightPath defendants after 2/18/22.

34 – He agrees that StraightPath did buy stock.

34 – In terms of whether any part of his work went into determining that StraightPath distributed stock to investors, he notes that he didn't review the brokerage records and solely concentrated on the bank records.

**34-35 – He is not aware of anyone at the SEC conducting an analysis to determine profits or investment returns earned by investors that invested in StraightPath.

36 – He is not aware of anyone that identified or took effort to identify stock distributed by StraightPath to investors.

36 – He agrees that StraightPath has somewhere around $200 million in stock assets.

36 – Exhibit ten of his Declaration is a summary of purchases of pre-IPO shares.

37 – In terms of analysis he conducted which is not contained in one of his exhibits, he said he took the money that came in from brokerage accounts and deducted the amounts that's going for cash distributions in the bank accounts and then deducting against people that used their IPO proceeds from one issuer to invest in another pre-IPO company so the net remaining account was approximately $10 million—when asked what his understanding of what that roughly $10 million number is, he states "I don't know."

38-39 – His data was maintained on Excel spreadsheets—the actual documents that he reviewed were contained in the SEC's repository called Recommind.

41 – He does not know whether the SEC's Excel spreadsheet was produced to the defense in document production.

**41 – He did not conduct any profit and loss analysis or calculations for the funds.

**41 – He did not conduct any profit or loss analysis or calculations for the investors.

42 – He did conduct an analysis of the surplus or deficit of stock in the remaining pre-IPO stock where he did not identify a perceived shortfall but does know if the information was produced to the defense.

42-43 – He did conduct an analysis to determine fees or profits earned by StraightPath but is not certain which exhibit the analysis is contained within.

**44 – Outside of markups, he did not assess any other fees or profits earned by StraightPath.

**44 – He did not conduct an analysis comparing the market or available prices of the pre-IPO stock from other sources with the price offered by StraightPath at any point in time.

45 – He did not review the PPM in any detail in this case.

45-46 – In doing his analysis to understand what could be profit or money that StraightPath earned, he did not look at the PPM to understand what fees and other types of profits StraightPath could earn as disclosed to investors.

46 – He did understand that StraightPath had fees/expenses associated in purchasing the stock which would be brokerage fees paid to someone who is brokering the transaction of the seller and StraightPath being a buyer.

47 -- He undertook a review of all the fees by stock which is contained in his Excel work product document.

47-48 -- He agrees that StraightPath had brokerage fees from finders in connection with their purchase of stock.

48 – On the purchase side there are fees that StraightPath had to pay out when they are trying to find stock.

48 – The purchase side fees for StraightPath included broker fees or transfer fees and other types of fees that StraightPath had to payout when it was purchasing shares.

49 – When asked what portion of any markup ultimately went out to these third-parties to pay expenses and what portion StraightPath kept, he states "there were a few instances where StraightPath kept fees for itself that it was refunded by other brokers.

49-50 – When again asked if he did an analysis which would show what portion of StraightPath's markup would have been paid out to third-parties for expenses, he states "yes I did, it's accounted in that analysis, it's subtracted out so in no way in any of my exhibits looking at markups have, you know, assessed the fees, they're subjected from everything, so the money going out for specific shares at a $1 price is matching up without deducting the fees."

**50-51 – He agrees that where there was money above what was that which StraightPath purchased the stock for, that the markups were used – those dollars were used to pay for fees to purchase stock.

51 – Smith claims that the fees don't go into the calculations in that he has already subtracted the fees before he began the markup analysis.

52 – From the inception of his work in this case, he focused on bank records – he was asked to review brokerage records but he never got to them because he didn't have time.

52 – He was only tasked to review bank and brokerage records. His Declaration was prepared by SEC attorneys– he reviewed and submitted comments and edits, before that time he had provided data to the SEC staff recording the bank record review he had done.

56 – As set forth in the Declaration, paragraph 5, he looked at bank records for SP Fund Manager, which is StraightPath Venture Partners, SP Advisor was StraightPath Management and SP Funds which is StraightPath Funds 1-9.

56 – He looked at Signature Bank and JP Morgan Bank records.

58 – Smith says that there was one more StraightPath related entity which was StraightPath Holdings.

60 – He states there were two instances where the principal sent their own funds to StraightPath and StraightPath sent the funds back.

60 – He also looked at the Quickbooks of StraightPath but didn't have access to the Quickbooks for Funds 7-9.

60-62 – He also looked at other StraightPath internal documents, including an investor list for each pre-IPO company, how many shares an investor invested in, what price and if there were fees paid out to a third-party for it. All of this was on a StraightPath Excel spreadsheet that "were only started around 2021." He also looked at welcome letters and also the Quickbooks records and he would find emails or text messages which would indicate how many shares the investor bought.

62-63 – He states that a profit and loss statement from StraightPath would have been helpful but no such document was produced.

66 – He states he was not aware that StraightPath was involved in ongoing conversations with the SEC about finalizing the reconciliation of Quickbooks.

67 – He ran search terms in emails specific to bank information.

68 – He also did search terms in text messages and he also went online to look at each of the individual's BrokerCheck FINRA reports.

70 – When asked if there was any other documents he could have had which would have assisted him in more accurately making conclusions in his declarations, he notes that there were 17 million of investor funds that came into the bank records and he does not know what shares they purchased, at what price and how many shares. (NOTE: At one level, this is the heart of the case. The Government is looking for a specific purchase of shares by an investor's funds at a particular moment in time. But, that is not how the StraightPath Fund worked. The investor received an interest which correlated to a certain number of shares which *ultimately* the investor always received. Must drill down with our expert on this issue: Is there anything inherently improper about the operation of such a fund.?)

72 – When asked whether he is aware that StraightPath was still in the process of working with the SEC to produce documents and that StraightPath had not completed its review as of May 13, 2025, he states "I don't know."

73 – He understands that K-1 to be a tax document that assesses value of what people are holding in a certain investment.

74 – He agrees that a K-1 can generally show whether an individual had a profit or loss.

**74 – Smith says as part of his work in this case he did not look at K-1s as, in his view, they are just going to give a number and not the underlying detail of what came with that profit and loss.

75 – He is not aware that StraightPath's CPA Tom Pirro produced all tax returns including K-1s.

75-76 – Smith reiterates that he didn't review K-1s in this case as he started with general ledgers and balance sheets and the profit and loss and claimed that there were multiple entries in the bank statements that weren't on the general ledgers—StraightPath wasn't accounting for everything that was in the bank statements.

79 – Paragraph 6 of his Declaration notes that he reviewed and scheduled out more than 15,400 separate transactions of line items spanning 15 accounts and two banks between August 27 and April 22, but he agrees that his worksheet was not produced by the SEC as it was work product. That document accounted for all the inflows and outflows of the bank accounts.

80 – Paragraph 7 of his Declaration notes that he has not set forth each and every fact that he knows about.

81 – As he sits there today, Smith cannot recall any of such facts.

82 – Q. What facts are you aware of that may undermine your calculations?

A. Nothing in mind would undermine my analysis.

Q. Recognizing you haven't looked at all the financial documents, including brokerage account statements, correct?

A. Yes. Right. But that doesn't affect my bank analysis in any way because I am already looking at the brokerage proceeds coming into the bank account and I am looking at the cash distributions from the bank account. I solely focused on the bank records.

Q. So really you have no idea what the brokerage accounts. . . you have no idea what the brokerage accounts say, you have no idea if those documents could undermine your calculation?

A. No, I do know because I am only looking at bank account records analysis, not brokerage record analysis. Nothing from those records would undermine what I am doing.

84 – Part of Smith's Declaration shows a roughly $14 million shortfall in stock.

85 – When asked whether it would have been helpful to look at the actual stock being held in the brokerage accounts when your accounting for stock shortfalls, Smith states it would not be helpful as "I am looking at pre-IPO companies that haven't gone IPO and you're talking about companies that have gone IPO.

**85 - Smith notes that he is stating that StraightPath is short $14 million in stock that they didn't purchase.

86 When, again, asked whether it would have been important to look at the brokerage accounts so that the court might be able to understand overall how much stock StraightPath has when addressing shortfalls. Smith reiterates that it is not important.

86 - Paragraph 10 of his Declaration talks about Michael Castillero and notes that he is one of the three founders and beneficial owners of the StraightPath Suite of entities and funds.

88 Smith states that he did not write that sentence but would define beneficial owner as one who controls the vast majority of a company or entity and that one would look mainly to incorporation documents.

89 – Smith states that on this issue he would look at the incorporation documents; Form ADVs, company websites, etc.

90 – Paragraph 10 also states that Castillero was the beneficial owner until February 2019 and in April was the majority beneficial owner of the SP Advisor and SP Fund Manager.

91-92 - Smith states he has no recollection of what documents he looked at in support of this statement.

92 – Smith states he can't remember whether he looked at operating agreements or corporate filings but notes that he believes he looked at such documents.

93 – He reiterates that he doesn't know what documents would show that Martinsen was the owner of StraightPath after February 2018.

95-96 – Smith repeatedly concedes that he does not know how the SEC was using the term "beneficial owner" as it related to Castillero and what documents supported such a contention.

96 – The same paragraph notes that Mr. Martinsen became the purported majority owner of both the SP Fund Manager and the SP Advisor in February 2019 when Castillero purportedly transferred his interest in these companies to Martinsen.

99 – Smith concedes that paragraph 3 of his Declaration contains a statement that "I make this Declaration based on my personal knowledge, information and belief."

99-100 - Smith concedes that he did not draft paragraph 11 which states that Martinsen became the purported majority owner.

** - Smith states "I don't remember" the basis for him stating, based on his personal knowledge, that Martinsen was the purported majority owner of the SP Fund Manager yet concedes he signed this Declaration just days ago.

102 -- Smith concedes he doesn't know the basis he had for stating that Martinsen was a resident of St. James, New York.

104 -- Smith claims he looked a variety of documents to determine Martinsen's ownership "I don't remember or can't recall which exact ones I looked at."

104 – Paragraph 12 of the Declaration similarly states that Ms. Lanaia is a beneficial owner.

105 – Paragraph 13 states that "Mr. Lachow from inception until around September 2021, served as the nominal manager of the SP Fund Manager."

105 -- Smith concedes that he didn't draft that statement.

106 – Smith concedes that he doesn't know what the term "nominal manager" means.

106 – Paragraph 13 states that after Castillero purportedly resigned in February 2019, Lachow became the managing member of the SP Advisor and 1% owner of both the SP Advisor and the SP Fund Manager.

107 – Smith concedes he didn't draft that sentence and doesn't recall what documents he looked at in support of such a statement. Smith concedes that he simply can't remember.

108 – Exhibit 2 is Operating Agreement of StraightPath Venture Partners 5/11/17.

111 -- Smith doesn't recall seeing the document.

111 – The document is executed by Eric Lachow but not managing member number 2.

112 Exhibit 3 is StraightPath Venture Partners Delaware filing dated 2/12/19.

115 - It states that Michael Castillero resigned as director and managing member and all member interests are transferred to Brian Martinsen who will be director and managing member of StraightPath Venture Partners LLC.

116 - Smith is asked to compare this document with his Declaration, paragraph 13, which states that Lachow remains a 1% owner and he says that this is what they represented to the State of Delaware but how they operated on a day to day level at StraightPath could be different.

117 – Smith's Declaration, paragraph 17 states that in addition to the StraightPath funds, bank records and other internal documents and spreadsheets from the fund manager show that the fund manager also collected investor money in its bank account and the bank account of SP Holdings.

118 - Smith is asked why this statement is in the Declaration and whether there was some issue or concern about investor funds going to the SP Fund manager and he notes that he was simply tracking the flow of funds.

119 -- Smith again states that he may have looked at the PPM in this case for any of the offerings but he doesn't recall.

121 – Exhibit 5 is a PPM, and Smith is asked about the use of proceeds section which states "the manager expects to use the net proceeds from the offerings to invest directly or indirectly in portfolio companies, and asked whether the manager could use the funds that came into StraightPath from investors, and Smith asked for clarification on the question.

**122-124 Smith is again asked about the fact that he expressed concern about funds going from the investors and ending up in the StraightPath manager's bank accounts but yet is unclear as to what the manager's rights were concerning the proceeds as set forth in the PPM and Smith responds that "there is comingling happening amongst the various funds and I remember viewing that each fund should be segregated and it was not segregated I saw instances of Ponzi like payments and that causes me great concern.

128 -- Smith reiterates his earlier testimony that the bank account records show inflows and outflows and that there are $17 million of inflows that are unaccounted for because "we don't have documents."

129 Smith is asked whether he did an analysis of every investment and notes that he looked at the inventory spreadsheets that StraightPath kept and they identified people that were using their IPO proceeds to invest in a new pre-IPO issuer and he in fact did categorize those amounts and scheduled them out.

129 -- He is asked whether he accounted for all reinvestments of money from investors and other offerings and concedes that he doesn't know if he captured all of them.

130 – Exhibit 1 and 2 of Smith's Declaration notes a total of 411,591 but he states that it could be more.

130-131 -- He calculated this number by looking at the bank account records as well as various documents in paragraph 5.

131 - StraightPath's bank account records were with Signature Bank and JP Morgan.

132 -- Smith now states that Exhibit 2 reflects the full analysis related to amounts raised and refunded except for the $17 million as they don't know which pre-IPO issuer it refers to.

**132 His analysis reveals $13,554,031 refunded to investors.

133 – Smith states this is the amount refunded based on an investor's initial investment and reflects instances where investors wanted their money back.

133 – Exhibit 1 is a summary of all amounts and Exhibit 2 is details of that summary.

133-134 – Smith states that a "refund" is an example where an investor didn't get their shares and they just wanted their initial investment back.

135 – Paragraph 19 of the Declaration states "based on the documents available to me I've calculated the deficit and pre-IPO shares across all SP Funds and other investment vehicles managed by the SP Fund Manager."

135 – Smith states that the documents he reviewed were the bank records and the specific documents referenced in paragraph 5.

139 – Smith states that he believes StraightPath was involved in approximately 24 offerings of pre-IPO companies since they started and he believes five or six have already gone public.

141 – Smith is asked with respect to Triller, one of the offerings that StraightPath had, whether there was a share surplus and notes that he would have to look at his records which would be contained in his Excel spreadsheet.

144 – Smith is asked if his analysis of StraightPath's offering of Chime also reflected as surplus of shares and Smith notes that again he would have to look at his records.

144 – He is asked about DataMinr and whether that was an offering that StraightPath had made of pre-IPO shares and whether StraightPath also has a surplus and again notes that he would have to look at his Excel spreadsheet.

145 – He is asked about Flexport and, similarly, whether it was an offering of StraightPath and that they, against, had a surplus of pre-IPO shares and agrees that Flexport is not oversold.

146 – He also agrees that StraightPath's offering of Zebra is not oversold.

146 – He is asked about StraightPath's offering of pre-IPO shares for Klarna and he agrees that they, too, are not oversold.

148 - He offers the same response concerning StraightPath's pre-IPO offering of Plaid.

148-150 Plaid, Space-X, ThoughtSpot, Zipline and agrees none of those are oversold.

**150 – He agrees that he has estimated that StraightPath has at least $200 million, possibly more, in current assets and stock.

151 – When asked whether it is true that StraightPath, thus, has more than enough assets to cover what Smith perceives to be a $14 million shortfall, he responds "I don't know" as some of StraightPath's assets are funds sent for other pre-IPO companies so would have to transfer money that they have already paid for other shares.

**152-161 – Q. I am making a simple point. There is at least $200 million in assets at StraightPath and, correct, that what we have talked about kind of numerous times, correct?

A. Yes.

Q. Ok. And my simple point is that you have calculated at this point a $14 million deficit, roughly, correct?

A. Yes.

Q. Ok. And some of that $200 million is StraightPath's money, correct, or stock, correct?

A. They're shares that they purchased for the investors.

Q. You are not aware, sitting here today, that some of the assets in StraightPath is actually owned by StraightPath in the form of fees or carried interest.

A. I don't know.

Q. Ok. So sitting here today, you have no idea how much of the $200 million is actually StraightPath's assets, meaning not investor assets.

A. It is my understanding that those are all belonging to investors and I think what you are referring to is if it goes IPO and there are some kind of profit or loss that's, you know, what you are referring to, so I haven't looked at that. I don't what that is but that's a hypothetical based on all of these going IPO. When they're pre-IPO they're pledged to the investors that are sending money to StraightPath. You can't just move funds from one issuer to another to account for those deficits.

Q. Just to be clear, we've just walked through a number of stocks that, sitting here today, based on your current calculation, StraightPath has more stock than they sold, correct?

A. As of today.

Q. Right, so all I'm saying is that StraightPath—you don't know, sitting here today, how much of the $200 million is actually owned by StraightPath? Meaning it's not investors, since they have stock that you have already said is more than has been sold.

A. I don't understand the question.

Q. StraightPath bottom line has an inventory in excess of what has been sold.

A. Um it has more shares than it sold – the question because inventory, you know, account should be zeroed out so we are referring to you know at any point in time there are surpluses and deficits and those change day to day. For all of these pre-IPO issuers, they always had a deficit at one point in time. What my analysis shows here is the deficit as of today.

Q. Let's try to make this clear. When you say "deficit," you are talking about oversell on a certain number of offerings, correct?

A. Yes. And they have taken money in from investors that they have no shares for, that happened from day one in the bank records.

Q. We just went through ten stocks that there is no deficit as of today, correct?

A. Yes.

Q. Do you understand that StraightPath buys stock at inventories and therefore can have stock it owns that they have not yet sold to investors, correct?

A. I don't know.

Q. You have no idea how StraightPath runs its business.

A. No, I do not work there and it's comingled and it's a comingled account so you have look at it holistically enterprise wide.

Q. So when you look at StraightPath, if it has, for example 300,000 shares of Triller it has not sold, it can go out in the market right now and sell its shares and have money, correct?

A. I have seen instances where they have used other investor money to purchase shares that they didn't want to buy so what I am saying is this is a whole big comingled mess and I think you are asking questions that do not really make sense to me because it is all comingled.

Q. I am asking a simple question. If there is Triller and they have 300,000 extra shares that has not been sold, yes or no they can go out and sell those 300,000 shares, correct?

A. So they are not putting any of their own money into these bank accounts to purchase the shares. The funds are coming from the investors to purchase the shares so in my mind StraightPath doesn't own those shares, you know, it's not using its own money. They investors are sending money to purchase the shares.

Q. So what you are saying in your analysis you are telling me that you have never seen in all the bank records that StraightPath actually used money that it received from fees or anything and purchased stock. StraightPath never used money that was its own to purchase stock, that's what you are saying.

A. At the time they could have but what they are taking out at the end of the day and paying themselves to third-parties is the difference between what they are buying from third-parties and what they are selling to investors. They have taken all the monies so I don't agree with that.

Q. You just said during your long statement that StraightPath has used at times its own money to buy stock.

A. I didn't say that.

Q. It's a very simple question and I know you are talking around it but I need a simple answer to a simple question. StraightPath if it has 300,000 shares- it's a yes or no—if StraightPath has 300,000 shares of Triller it is not sold to investors it could go out today and sell that stock and have cash from the sale, correct? Yes or No.

A. No.

Q. It can't go out and sell Triller today if they had access inventory, that's not possible?

A. They are selling--they are selling the shares to investors so they are taking in money before they make those purchases so your hypothetical doesn't make sense to what happened.

Q. No, you are not answering the question, sir. Triller, I am making a statement that they have 300,000 shares currently in inventory beyond what has been sold. With that understanding,

I am asking you could they not go out with that 300,000 shares they have, not shares they don't have, but shares they have and go sell them and make money today. Could they not do that, sir?

A. Those funds are belonging to investors. Investors sent in money for shares. They belong to investors.

Q. And this under your notion that StraightPath has never used its own money to purchase stock?

A. It happened a very small amount of time in the past few months.

Q. So the past few months is the first time StraightPath ever used funds it received from fees or markups to pay for stock?

A. StraightPath has already taken out the fees to pay itself so I don't understand the question.

Q. So are you not aware of the fact that StraightPath gets fees including markups and carried interest and uses that money to buy stock?

A. I don't understand the question because at the end of the day I am looking at the analysis of today, what do the bank records show.

Q. I am asking a simple question. I am not asking a broad picture question of everything you analyzed. I am asking a simple question. Are you aware of the fact that StraightPath received fees in the form of various ways, whether its carried interest or otherwise and used that money to buy stock?

**A. I don't know. It's all like comingled and there's Ponzi like payments and unless I can have more details, general ledgers and you know, profit and loss statements, balance sheets to account for flows of funds, there is money moving amongst all of these bank accounts that are just unaccounted for. They are just simple transfers. So I guess what you are asking is if I found it in a financial record. Yes, I can say one way or the other but the internal records at StraightPath don't account for those scenarios.

165 – Q. At the end of the day sir, by way of example if StraightPath currently has an inventory of 300,000 shares of stock more than it has sold to investors, could it sell that stock to investors or could it not?

A. If it purchased the shares for itself and they sent funds to purchase the shares, yes.

Q. Ok, then ultimately that would be cash on hand which could be used to cover deficits from the stock that you have identified. Correct?

A. I don't understand.

Q. If they have cash on hand from the sale of stock they own, they could use that to cover the $14 million deficit, correct?

A. Right but I would have to look at what the investors are sending their money for. Are they purchasing shares in that company that they are going to buy, I don't know.

Q. And you also understand, tell me if you don't, that StraightPath in connection with this matter, when they learned that this action to be filed agreed to put $15 million in escrow to cover the shortfall, are you aware of that fact?

A. Yes.

169 (NOTE: There is an on the record conversation among the attorneys that the SEC has asserted attorney work product privilege over the backup Excel spreadsheets prepared by Smith in support of his findings, the SEC during the deposition agreed to release a single spreadsheet without waiving privilege as to the other matters. Must explore with Nelson Mullins whether we now have these other spreadsheets).

169 – At the time Smith did his analysis, there were ten separate pre-IPO stocks offered by StraightPath where there is not a shortfall.

170 – Smith prepared a master Excel spreadsheet concerning the bank records of StraightPath which also provides detail as to these ten stocks.

172 – Smith also prepared separate spreadsheets for each of the exhibits contained in his Declaration.

173 – In determining which stocks for which there was a deficit, Smith looked at his spreadsheet to arrive at the number.

174 – Smith went company by company and looked at the ones that had a negative amount and created the exhibits.

**175 – The SEC only included stocks of companies that deficits in the Smith's Declaration.

175 – (Moving to a different topic). Smith is asked whether his analysis did a total number of investor distributions and indicated that he did but it is not contained in his report.

176 – From memory, Smith believes it was more than $10 million but less than $50 million and notes that the information is contained on a pivot table categorizing all inflows and outflows in his Excel spreadsheet.

177 – Again, Smith reiterates that he didn't look at brokerage accounts. His analysis was a cash analysis. Smith did not do an analysis of how much cash in the accounts is actually StraightPath's in that he didn't account for fees earned and carried interest earned but notes that if they took all the money coming in from the brokerage accounts and deducted from the investor distributions as well as profits from IPO companies, they could determine a figure representative of that.

181 – Smith states that the figure StraightPath has taken out to pay themselves and pay the third-party finders exceeds the total amount of markups from what they purchased from third-parties and what they sold to investors. (But, note, StraightPath also makes money from carried interest).

**181-182 – Besides markups, Smith can't account for any other fees or monies earned by StraightPath as he didn't conduct that analysis. Smith notes that he was unaware that immediately prior to the SEC's filing of this civil Complaint, StraightPath was in the process of reviewing documents to produce to the SEC concerning each offering and whether they were oversold.

184 – Two months before the SEC's filing, the SEC asked StraightPath to begin its own audit with four stocks: Rubrik, Eat Just, Impossible Foods and C claims that the total amount of markups from what they purchased from third-parties and what they sell to investors Kraken.

**185 – In doing its review, StraightPath self-reported to the SEC shortfalls in both Rubrik and East Just. (Note: Must get this report from Nelson Mullins).

**185 – Smith is asked whether he was aware that concerning Rubrik, Brian Martinsen used his own funds to purchase additional shares to account for part of the shortfall and noted that he was aware of that fact.

**186 – Smith was unaware that Martinsen had lined up additional shares of Rubrik to finish taking care of the shortfall when the SEC filed its complaint.

186 – Smith was similarly unaware that Martinsen had lined up shares of Eat Just to purchase to take care of that shortfall.

188-189 – Smith agrees that investments into the StraightPath fund ceased as of February 18, 2022 and that StraightPath had voluntarily agreed to a standstill while they worked through these issues with the SEC and that there were no distributions of cash or stock to any defendants since that time.

191 – Defendant's Exhibit 5 is a March 30, 2022 email regarding Rubrik acquisition from Megan Genet. The email states:

> The staff has reviewed the document StraightPath identified concerning Rubrik share acquisition. The general ledger for StraightPath Venture Partners LLC reflects the acquisition of 899,061 shares of Rubrik, 575,484 of which are substantiated to one degree or another by the documents identified in counsel's March 16, 2022 email. However, the investor list reflects SP Venture Funds 1-9 have sold about 1,749,435 shares of Rubrik.

Smith is then asked whether he was involved in the 1,749,435 calculation and he advises that he did and it's the first time he is hearing of that number.

194 – In Exhibit 4 of Smith's Declaration, he had a number of 106,830 shares of Rubrik sold and he is asked why the email states 1.7 million and he advises he didn't do the work that is in the email.

**196 – Smith's Declaration of shortfall stocks references seven stocks and he did an analysis of all 24 stocks offerings.

203 – The calculation of investor purchases would be on Smith's master Excel spreadsheet and Smith notes that there are pivot tables based on whatever value one is assigning for each row.

204 – Smith noted he created a separate spreadsheet for the instance where investors are using their IPO proceeds to invest in a new IPO issuer as that wouldn't be reflected in bank records.

**206 – Paragraph 25 of Smith's Declaration states: With respect to the pre-IPO UiPath, between February 2, 2021 and March 8, 2021, the SP Fund Manager sold more than 25.5 million in series interest in its pre-IPO shares; do you see that.

A. Yes.

Q. It says, "the SP Fund Manager however never paid for any UiPath pre-IPO shares at all. Ultimately, more than 17.5 million of those investments were moved over to Series Interest and other pre-IPO shares and the SP Fund Manager refunded more than $8 million to investors who do not wish to do so." Smith is then asked if he had knowledge of StraightPath arranging for the purchase of UiPath shares and notes that he does recall seeing chats where they are engaging with a broker to purchase the shares, meaning text messages.

207 – Smith notes that he is unaware what led StraightPath to not purchasing UiPath. (Note: This is critical; must review with Martinsen; and must determine whether welcome letters ever issued to anyone in connection with their purchase of StraightPath shares).

**208 – Smith is asked if he reviewed all text messages related to UiPath and he notes that he tried to but admits that he is not aware whether a seller actually ended up preventing the purchase from going forward—all he knows is that he didn't see funds being sent out of the bank account to purchase those shares.

****208 – Smith is asked whether he is aware that StraightPath, under its offering documents, can accept capital from investors before a closes on the purchase of a pre-IPO stock and notes that he "doesn't understand the question" and concedes that he did not review any of the offering documents.

209 – Smith did not read the private placement memos or the operating agreements.

****210 – The questioner (Scott Sherman) defines the offering documents as the private placement memo, the operating agreement and subscription agreement and Smith agrees that these documents generally outline what a manager can and cannot do.

211 – Smith's analysis was that StraightPath raised $25.5 million in Series Interest in pre-IPO shares for UiPath and $17.5 million was moved to other Series Interests and more than $8 million was refunded. (Note: This was all done before the SEC stepped in. Doesn't this show a lack of criminal intent???)

212 – Smith is unaware of whether there were any complaints filed by any investors related to UiPath.

**212-213 – Smith agrees that he accounted for $25.5 million coming in from investors for UiPath and that he was able to account for where the $25 million went either in terms of refunds or other investments.

213 – Smith states that his analysis was that he calculated a collective shortfall in pre-IPO shares of nearly $14 million across seven pre-IPO companies but he did not do an analysis comparing the percentage of the total amount raised to the alleged shortfall.

**213-214 – Smith agrees that the total amount raised was roughly $411 million and there was a deficit of $14 million which is approximately 3.4%.

214 – Exhibit 4 of Smith's Declaration is a spreadsheet that purports to show the shares purchased by StraightPath and the shares investors purchased or refunds.

215 – Again, Smith reiterates that it was his review of bank records which was the primary source of this data (as opposed to brokerage statements, subscription documents, emails, etc.).

215 – Smith states the only time he had move from the bank records was when an investor was using their IPO proceeds to invest in another pre-IPO company and that information would come from spreadsheets that were produced by StraightPath.

216 – (The topic now moves to "comingling"). Smith agrees that the definition of comingling means money coming from multiple sources.

217 – Smith agrees that generally, comingling, combining money from multiple sources, does not have a fraud component in and of itself.

217 – Even though Smith did not review any of the offering materials for StraightPath, he was generally aware that StraightPath could earn money from markups.

218 – Smith does not know whether StraightPath disclosed to investors that it would be marking up stock.

218-219 – Smith was not aware whether the StraightPath manager could charge each member a fee equal to 1% of their capital contribution.

219-220 – Smith cannot provide a definition of the term carried interest.

220 – Smith is unaware whether StraightPath disclosed to investors that they could take carried interest in connection with its offerings and when asked whether he thought it important in analyzing the information whether he had understanding of what fees StraightPath could earn, he reiterates that he only looked at a bank account analysis.

221 – Smith is asked whether understanding what fees StraightPath could earn would be important to understand what assets are StaightPaths sitting in the bank account. Smith defers and states that there is only $2 million left in the bank accounts.

221-222 – Smith is then asked whether he has looked at the bank accounts since 2017 and he advises that he has and is again asked whether it would be important to understand how much of those dollars were StraightPath's carried interest. Smith says that he looked at the money coming in from brokerage accounts, he subtracted the money that is sent out for investor distributions and also investors that chose to move their IPO provides to another pre-IPO company.

223-224 – Smith then, oddly, testifies that he did calculate carried interest and then he is confronted with the fact that he didn't look at the PPM and doesn't even know the definition of carried interest.

224 – They both agree the definition of 2 and 20 is the concept of a typical 2% yearly management fee based on assets under management that a fund can charge (and 20 on the backend).

225 – Smith is unaware of whether StraightPath could charge the 2% management fee and whether they did charge a 2% management fee.

225 Paragraph 5 of Smith's Declaration states that he looked at welcome letters.

226 – Smith is unaware whether StraightPath charged a management fee.

226 – Smith is unaware whether StraightPath could have charged a due diligence fee.

227 – Smith is unaware whether StraightPath disclosed they could charge a marketing agent or private placement fee.

**227 – Smith cannot define the term marking agent or placement agent.

228 – Smith is unaware whether StraightPath could have charged and disclosed a performance bonus fee.

229 – Smith is unable to define "waterfall."

229 – Smith is unable to state what calculations StraightPath was using for distributions as he didn't do that analysis—all he did was categorize the movement in the bank accounts, the money moving from brokerage accounts to bank account for distributions.

230-231 – Smith never did a calculation to determine the carried interest earned by StraightPath at any point.

232 – Defendant's Exhibit 6 – an Excel spreadsheet regarding amounts raised and refunded (this is the spreadsheet purportedly revealing the $17 million oversold shortfall.

233 – This spreadsheet provides an inventory account – all the money coming in from investors or being refunded to investors. Smith does not know which pre-IPO companies they are purchasing, how many shares, what price.

233-234 – Smith agrees that information would come from the welcome letters and QuickBooks. (Note: We must be sure we have a full set of these documents).

234 – Smith agrees that his spreadsheet indicating the money that came in does not include investor names and Smith says he has such information in his work product.

235 – Paragraph 30 of his Declaration states "based on my review of the documents neither SP Fund Manager nor Castillero, Martinsen or Lanaia kept records of the fees that either the SP Fund Manger or the SP Fund purported to accrue, collect or payout.

237 – Smith concedes that he never read any of the subscription documents and simply recalls the welcome letters which zeroed out a number of fees.

237 – Smith states that he did not see any fees accounted for in the Quickbooks.

238 – He agrees that simply because he didn't see the word "fees" in Quickbooks he viewed them as unaccounted for.

238 – Smith adds that there was no profit and loss records submitted by StraightPath.

238 – He has no knowledge of the fact that StraightPath has just completed its reconciliation of its Quickbooks and produced profit and loss and trial balance sheets. (Note: Must get these).

239 – Smith states that he did account for the markup which he can see in the bank records through inflows and outflows.

**240 – Smith states that the total amount of markup is over $100 million.

241 – Smith states the total amount raised was over $400 million and concedes that he does not know all the fees that StraightPath disclosed or could charge to investors.

241-242 – Smith concedes that while paragraph 31 states the general ledger describes transfers from the manager and the funds without identifying whether the transfers are accrued fees or other compensation it doesn't mean the transfers were improper as it could be for accrued fees or carried interest.

244 – Smith concedes that he doesn't know whether money in a fund account was ever money that was accrued fees earned by the Manager.

245-26 – While Smith's Declaration states that he saw money moving at times between one fund and another, he concedes that it is possible that the transferred money was accrued fees that was StraightPath's money that it was using to buy new stock.

249 – Concerning shortages or deficits of stock, Smith contends that he saw intermittent shortages and deficits throughout since 2017 and states that a deficit should never have existed. (Again, the issue here is deficit at what moment in time, when the welcome letter went out or when the investor made the deposit).

250 – Smith then concedes that he has only notified the Court, as of the date of his deposition, that he saw seven stocks with deficits.

252 – Smith then reiterates that he saw deficits concerning every pre-IPO stock at one point in time. (Note: Again, two issues. First, obviously, all of these deficits were cured as in Smith's Declaration he talked about a shortage of $14 million (3.4%) over $400 million raised and deficit at what point in time – welcome letter or date of deposit or, did welcome letters go out at a point in time when a contract was in place to purchase the shares).

259-260 – Smith concedes (reluctantly) that concerning the notion of "comingling" it's possible that when StraightPath sold stock it had an inventory and received money from an investor it simply used that money to buy additional stock and such transactions would all be coming out of the same account but not be improper.

260-261 – Paragraph 39 of Smith's Declaration states that $48 million was paid to unregistered sales agents and more than $5.6 million in commission payments.

261 – Smith's analysis was based upon the fact that $48 million in outflows from the bank statements went to the individual's bank accounts who were not registered in the FINRA database.

262 – These figures are contained in Smith's master Excel spreadsheet.

264 – Smith concedes that when StraightPath was acquiring the stock all of it was *private stock* that was going to be acquired by the fund.

264 – Smith states that he has no understanding of what brokers may charge in finding stock for funds like StraightPath and doesn't know what fees may be charged by the pre-IPO company to transfer stock.

268 – When asked where the money came from to pay finders or broker dealers their fee, Smith states that the money came from the bank account records. It's either coming from the investors or the brokerage account.

**** ____ – When asked whether he did an analysis to determine that the fees paid by StraightPath to brokers were coming out of StraightPath's markup, Smith indicates that he didn't do the analysis.

****____ Smith concedes that he spent a lot of time calculating markup but he didn't do a calculation to try to assess how much of that markup went to pay third-party fees and acquiring the stock.

****270 – Smith concedes that he spent much time calculating how much went to broker dealers and finders and calculated that at $48 million.

****270 – Smith is then asked if he ever attempted to tie the two, meaning the markup number versus the fee number to understand how much of the markup was being used to pay the brokers.

270-271 – Smith states that that number can be established in a spreadsheet by looking at the "pivot tables" but concedes that it's not in his Declaration.

271 – Paragraph 43 of the Declaration states that the SP Fund Manager and SP Advisor charged markups which represented the difference in the price the SP Manager paid for the pre-IPO shares and the price the SP Manager sold the corresponding Series Interest.

****____ - Smith concedes that he didn't do any analysis comparing the average sales price to investors and the *market prices* for which an investor could have purchased an interest in the same pre-IPO stock at the same time from a different fund and he has no idea whether or not what StraightPath was charging was *market price* at that time.

277 – When speaking of stock held by StraightPath and inventory, Smith concedes that when StraightPath is holding the stock it carries market risk as some investors may never want to purchase the stock.

****278 – Smith concedes that when StraightPath sells stock, it should have the right to sell the stock at a reasonable market price.

**278 – Smith didn't do any analysis to determine what costs may affect a markup.

287 – When asked to define Ponzi-like, Smith states when one is paying an investor their money back with funds from a new investor coming in.

287 Smith states one instance of a Ponzi-like payment would be when there was a refund to an investor.

288 – Smith is asked whether such a statement includes the assumption that the money in the bank account is from a new investor as opposed to funds owned by StraightPath and Smith states that in some instances, the only way to make the outgoing withdrawal to an investor is from the new money coming in based upon the bank balances at a specific time.

289 – Smith is then confronted with his earlier testimony where he conceded that at times StraightPath had stock in inventory which it sold to investors and the money coming in was StraightPaths.

**289-290 - Smith is then asked, isn't it true that under that circumstance, StraightPath can use their own money to distribute to new investors and Smith states that he is describing "Ponzi-like behavior."

290 – In short, Smith concedes that he was looking at simple math, simple bank account funds going in and out.

290-291 – Q. But you are making an insinuation that because money came in and then went out to an investor in this example a refund, the only answer is that it has to be a Ponzi-like payment?

A. Yes, the only way for that investor to get their money back is from new investor money coming in.

Q. Unless that money is no longer the investors that came in because it was used to purchase stock, correct?

A. I guess.

(Note: Smith continues to concede this important point through page 294).

294 – Q. Bottom-line, let's ask this. If the money comes in and StraightPath had inventory and that money came in and StraightPath had the stock in surplus it would have every right to take $100 and use it however it saw fit, correct?

A. I don't know.

Q. You don't know if StraightPath has the right to use it's own money how it sees fit?

A. I don't know.

297 – In Smith's Declaration he notes that $411 million was raised by StraightPath and he separately referenced $48 million going out to broker dealers and finders, the $411 million raised does not include on the face of it any monies paid out to broker dealers.

****298 – Smith concedes that the $411 million was simply the inflow.

300 – Exhibit 8 of Smith's Declaration lists "average markups" and "weighted average cost basis". Smith explains that StraightPath is purchasing shares throughout time at different quantities and different prices so he would weight them all and determine an average and at the same time determine an average sale price and the difference represented the markup.

301-304 – Again, Smith is asked a series of questions designed to establish the obvious—that a percentage of the markup surely was used to pay fees StraightPath has to acquire the stock and Smith gives a series of confusing answers and concedes that he never did any analysis to determine why StraightPath might charge a markup on average for a particular stock.

305-306 – Paragraph 47 of his Declaration states that "in 2021 as the SP Fund faced share deficits across multiple series, these markups increased as did the payments to founders."

306 – Smith concedes that he didn't do an analysis of what was happening in the market in 2021 in terms of dramatic increases for prices of stock.

306 – Smith is asked whether he is trying to insinuate that in 2021, markups increased because deficits increased and Smith states "they occurred in tandem."

****307 – Smith is asked whether he did an assessment of the issue that stock prices were higher in 2021 because the market prices increased which could explain markup increases as it was a percentage of stock price and Smith concedes that this could be true.

309 – Page 25 of his Declaration states as follows:

> "With respect to the pre-IPO company UiPath, between February 2, 2021 and March 8, 2021, the SP Fund Manager sold more than $25.5 million in Series Interest in its pre-IPO shares. The SP Fund Manager, however, never paid for UiPath pre-IPO shares at all. Ultimately, more than $17.5 million of these investments were moved over to Series Investments and other pre-IPO shares and the SP Fund Manager refunded more than $8 million to investors who did not wish to do so."

309-310 – Smith agrees that he accounted for all the money either being refunded or folks getting their funds put into other investments. (Note: This shows a lack of criminal intent but

we must determine whether investors received welcome letters for UiPath or did it simply represent money coming in without yet a welcome letter issuing -this is critical).

311 – On this issue, the SEC's memo of law in support of the appointment of a receiver states, "when the SP Fund Manager was finally forced to admit that it could not acquire the UiPath pre-IPO shares that it had promised, Martinsen, Castillero and Lanaia urged their sales agents to convince these investors to move their investments to other pre-IPO companies."

311-312 – Smith is confronted with the fact that the memo cites him as the sole source for this information but none of it is contained in his Declaration.

**313 – Smith concedes that he didn't see evidence of that fact, but did see text messages referencing the fact that the deal to purchase the shares fell through and asking investors whether they wanted their money back or they wanted to do another pre-IPO company.

**314-315 – Smith concedes that it is plausible that the deal to buy UiPath fell through and StraightPath was simply telling their sales force to inquire of investors what they wanted to do.

**315 – When asked whether he has any knowledge of Lanaia, Martinsen or Castillero urging or convincing investors to move their investments, he states "I don't know."

**<u>Cross-Examination by SEC Attorney Greenwood</u>**

321 – Defense Exhibit 1 (Exhibit 10 of his Declaration) represents funds sent to third-parties to purchase pre-IPO shares, but smith states that he doesn't know whether all of the shares had in fact been purchased and never did such a verification.

322 – Exhibit 1 simply indicates that the inflows represent $411 million from investors to purchase shares.

322-323 – Exhibit 6 and 7 of his Declaration represents amounts paid to each of the individual defendants based upon bank records he reviewed which reveals a total of $75 million going to four individuals throughout that time--$25 million for Martinsen, over $24 million to Castillero and Lanaia and just under $1 million to Lachow.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

PLAINTIFF,

v.

STRAIGHTPATH VENTURE PARTNERS LLC,
STRAIGHTPATH MANAGEMENT LLC,
BRIAN MARTINSEN,
FRANCINE LANAIA,
MICHAEL CASTILLERO, AND
ERIC LACHOW,

DEFENDANTS.

**22 Civ. 03897 (LAK)**

**DEFENDANTS' NOTICE TO TAKE DEPOSITION UPON ORAL EXAMINATION**

**NOTICE OF DEPOSITION**

TO: Plaintiff Securities and Exchange Commission
c/o Lee A. Greenwood
Philip A. Fortino
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004
GreenwoodL@sec.gov
FortinoP@sec.gov

**PLEASE TAKE NOTICE** that, pursuant to Rule 26 of the Federal Rules of Civil Procedure, Defendants StraightPath Venture Partners LLC, StraightPath Management LLC, Brian Martinsen, Francine Lanaia, Michael Castillero, and Eric Lachow (hereinafter "Defendants"), by and through their attorneys, Cahill Gordon & Reindel LLP and Nelson Mullins Riley & Scarborough LLP, will continue to take the deposition of Douglas J. Smith, Staff Accountant in the Division of Enforcement in the New York Regional Office of Plaintiff Securities and Exchange Commission (the "SEC"). The deposition will take place virtually via Cisco Webex or other

reliable electronic means on Tuesday May 24, 2022 starting at 1:00 p.m. eastern time. Unless mutually agreed otherwise, the deposition will continue from day to day until completed. The deposition shall be taken before a Notary Public or other officer authorized to administer oaths, and the testimony shall be recorded by stenographic and sound-and-visual (videotaping) means.

Dated: New York, New York
May 21, 2022

**CAHILL GORDON & REINDEL LLP**

/s/ Brian Markley
Brian Markley and Samson Enzer
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3230 / -3125
Facsimile: (212) 259-5420

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Scott N. Sherman
Scott N. Sherman and Josh Lewin
201 17th Street NW
Atlanta, GA 30363
Telephone: (404) 322-6231
Facsimile: (404) 322-6338

*Attorneys for Defendants*

# EXHIBIT B

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

May 13, 2026

**BY ECF**

The Honorable Jesse M. Furman
U.S. District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Castillero, et al.*, 23 Cr. 622 (JMF)**

Dear Judge Furman:

The Government respectfully writes in response to the Court's order dated May 1, 2026 directing the Government to: (1) list (and, if available, provide links to) any media appearances by any of the defendants beyond those referenced in footnote 14 of the Government's sentencing submission; and (2) describe the statements any defendant made during any public appearance that the Government believes to be false.

*Media Appearances*

In addition to the appearances listed in footnote 14, the Government would bring to the Court's attention the following additional public media appearances by Michael Castillero:

- FreedomTalk, People's Tribune Council Alert: Michael Castillero, Dec. 31, 2025, https://www.youtube.com/watch?v=3aQi64Jl9B8
- Diamond and Silk, Targeted by Lawfare, Feb. 10, 2026, https://rumble.com/v75l1v2-targeted-by-lawfare.html
- Battlefront: Frontline with Dustin Faulkner, Did the SEC and SDNY Drain Stock Market Entrepreneur and Investors Through Lawfare, Feb. 10, 2026, https://rumble.com/v75jt42-late-night-return-and-the-fractures-are-appearing-in-your-country.html
- David Zublick's Awake Nation, Feb. 20, 2026, https://rumble.com/v75zkkc-the-awake-nation-live-02.20.2026.html?e9s=src_v1_s%2Csrc_v1_s_o&sci=5570ca79-4d8e-4ad3-8907-2f3220c4f353
- The Targeted Show, Mar. 2, 2026, https://rumble.com/v76hn3k-the-targeted-show.html?e9s=src_v1_cbl%2Csrc_v1_upp_a

Case 1:23-cr-00622-JMF Document 228 Filed 05/13/26 Page 2 of 13



- Flip the Switch w/ Jenn, Politically Persecuted and Prosecuted ***Michael Castillero***, Mar. 9, 2026, https://rumble.com/v76jdca-politically-persecuted-and-prosecuted-michael-castillero.html

- X America News, Lawfare Hit Job, Mar. 17, 2026, https://rumble.com/v779gek-lawfare-hit-job.html

- X America News, Betrayal and Corruption at the DOJ w/ Michael Castillero, Mar. 19, 2026, https://rumble.com/v77bzd8-betrayal-and-corruption-at-the-doj-w-michael-castillero.html

In addition to these public appearances, the Government would also bring the Court's attention to an article by Jenn Baker, From 'No Evidence' to 'Full Prosecution' – How the SDNY Revived A Dead Case To Crush Michael Castillero, The Gateway Pundit, Mar. 9, 2026,[1] which Castillero shared with his own commentary on his public Instagram account, as displayed in Exhibit A, along with other screenshots from Castillero's Instagram account commenting on this case.

*False Statements in Media Appearances*

As noted in the Government's sentencing submission, Castillero has made repeated false statements in his public media appearances. These false statements, collected from a portion of Castillero's appearances (and one of Martinsen's), are categorized below. In the interest of efficiency, given the repetitive and lengthy nature of Castillero's appearances, the Government has not catalogued every false statement in every media appearance.

*First,* Castillero has falsely claimed that he and his co-defendants fully disclosed all relevant information to the SEC, that the SEC never issued StraightPath a corrective action notice (*contra* GX 400), and that his obstruction conviction was based on a misunderstanding, contrary to the trial evidence and the jury's verdict. For example:

- From the "Cowboy Logic" interview Castillero gave shortly after his conviction on November 29, 2025, at 4:53[2]: "But we were being ultra compliant just because one of my business partners was a compliance person and she wanted to be ultra compliant, above and beyond. So they decided on that, on voluntary information that we provided, to build a case to take the company from us, and then two years later indict us criminally as well."

- The Truth with John Gordon, on December 18, 2025, at 5:50[3]: Castillero: If you look at the rules of the exempt reporting adviser, it basically states that you just have to disclose

---

[1] https://www.thegatewaypundit.com/2026/03/no-evidence-full-prosecution-how-sdny-revived-dead/#commentshttps://rumble.com/v76hn3k-the-targeted-show.html.

[2] Cowboy Logic – 11/29/25: Michael Castillero, https://rumble.com/v72ad8s-cowboy-logic-112925-michael-castillero.html.

[3] Biden-Era Lawfare? – Michael Castillero Claims He Was Targeted, The Truth with John Gordon, https://www.youtube.com/watch?v=-SkU76jaJv4 (Dec. 18, 2025).

that you're doing business right, and if they think you're doing something wrong, they issue a corrective action. That's what the Securities and Exchange Commission is, it's supposed to issue a corrective action and give you time to fix it. They just never did.

- *Id.* at 10:00:
  - Interviewer: What was the factual basis for the obstruction charge?
  - Castillero: So they combined May into basically made May look like one long day, in May of 21. So in May 1st of 21, we let our counsel know that we were had some emails for some sales agents we just didn't want to have, and we we disposed of their emails and limited their- we uh removed their email access. So by May 20-something, they're asking, the SEC is asking for everybody's emails. Well it's a 20-25 day gap, right. Now, they made they portrayed May as a long day that they said okay, why don't you have these emails, and I'm like, because we let them go in early, on the first of the month. We let them go on the first of the month; you're asking for their information by the end of May, we didn't even know you were going to ask for anything about their information.

    So, everybody was made aware of anything across across the board and they just ran and twisted the truth. They showed the jury thousands of text messages, me and my wife's social media account, which, 2020, you know me and wife went down the rabbit hole, obviously being stuck home and whatever's going on and heavily posted about the election being stolen and all these other actions that led them to do that.
- Steel News with Ann Vandersteel on December 19, 2025, at 6:09[4]: Castillero: They convicted me of two counts of obstruction of justice, which are laughable because we voluntarily gave them information.
- *Id.* at 8:00: Castillero: We've always given them everything, right. So under the eyes of the SEC we're what's called an exempt reporting advisor, so let's say they just want to know that basically we're doing good business and and you know if we buy 100 shares of something, we only sell 100 shares of something. But we were being that partner had 35 years compliance experience with brokerage firms, she decided to give them 10 things. So being that she gave that and ultra compliant because we were doing business with a lot of boutique broker dealers that wanted our product, it became something that, in 2021, they they turned all our voluntary information into a case against us.
- *Id.* at 19:19:
  - Interviewer: What proof have you offered the SEC to prove that you weren't selling naked shares?

---

[4] Targeted by Agencies. Claims, Convictions, and Clemency: An Evidence-Based Review, Ann Vandersteel, https://www.youtube.com/watch?v=am1UeeoOnho&list=FLIFZ5mTVgJijAHdxAC-gtgA&index=2 (Dec. 19, 2025).

Case 1:23-cr-00622-JMF Document 228 Filed 05/13/26 Page 4 of 13



  - Castillero: We have everything; they've always had everything. What happened is they tried to cause a shortage by not allowing us to pay stock at the end when they tried to take the company from us, and when they when we paid for stock, technically actually we paid about I think it was about $4 million contract that we paid for and then Brian my partner wanted to pay for another contract. They were trying to block us from paying that because they wanted to create that narrative. So again, the SEC should always issue corrective action if they find a mistake somewhere. They never did. They said that it was a four-year emergency shutdown. I don't know what emergency takes four years to come through. Right? And it's a change in administration, it's a change in administration emergency.

- Diamond and Silk, on February 10, 2026, at 32:25[5]: Castillero: At least once a year we were audited by them [the SEC] and everything was fine.

*Second*, Castillero has falsely claimed that StraightPath fully disclosed markups to investors, again contrary to his proffers, the trial evidence, and the jury's verdict. For example:

- The Truth with John Gordon at 1:48[6]: Castillero: In 2018, 2019, up until 2020 we accumulated 6 and a half million shares of Palantir, at around $8 was our average cost. Everything was disclosed to the customers. We were an exempt reporting adviser, that means obviously there's not trading, so we don't have to disclose trading registers and so on.

- Battlefront, on February 10, 2026, at 1:19:53[7]: Castillero: We had fine print, we had disclosures right, there was a markup on the shares. Everybody that was buying pre-IPO shares knows there's a markup. It's disclosed in our 140-page document like 7 times. It's like you're going skydiving and it's like if you don't wear a parachute you're going to die, if you don't wear a parachute you're going to die, if you don't wear a parachute you're going to die, you decide not to wear the parachute, and I didn't know I was supposed to wear the parachute. It's absurd the mountain they've created out of lies. It's unbelievable how AUSAs and government agencies can just lie to create something out of nothing. It's unbelievable.

- *Id.* at 1:37:45 Castillero: They brought them in to say that the markup was criminal. By the time we were done with the expert, that if we charged what the SEC want quote un quote said that we should have charged—y'know because they change their stance every three minutes—the customers would have probably would have taken a bigger financial hit than if they took our disclosed markup.

[5] https://rumble.com/v75l1v2-targeted-by-lawfare.html.

[6] https://www.youtube.com/watch?v=-SkU76jaJv4

[7] https://rumble.com/v75jt42-late-night-return-and-the-fractures-are-appearing-in-your-country.html.

*Third*, Castillero has claimed that there were no victims of his crimes, ignoring the heart of the scheme for which he was convicted, namely, the undisclosed markups. For example:

- Truth with John Gordon at 4:15[8]: Castillero: Out of 2200 customers they brought in four [victim witnesses], that really did business with our fund because their friends or neighbors made so much money with us, but they were ticked off at the receiver after the company was taken from us.
- Diamond and Silk at 26:28[9]:
  - Interviewer: Who was the victim?
  - Castillero: Me? There's no victim. Me and my two business partners, I guess. There was no…
- Battlefront at 1:16:28[10]: Castillero: They [SDNY] know we did nothing wrong. They charged us on investment adviser fraud, wire fraud, conspiracy, obstruction of justice on voluntary information. And they're claiming there was customer losses, I'm telling your right now, we had over 2200 investors, not one customer complaint, not one customer loss during that time.

*Fourth*, Castillero has falsely claimed alternatively that there was no share shortfall (*contra* GX 1026-1030), that he lacked the evidence to challenge the share shortfall allegation, or that it did not matter. For example:

- Battlefront at 1:14:59[11]: Castillero: They took our voluntary submissions and built a case, and in May of 22 they took the company from us, basically at gunpoint, they declared us a ponzi-like scheme, I still don't know what that means. They said we had a $15 million shortage out of $410 million dollars raised, which, $14 million is a lot of money, but on the whole scope of everything is $400 on a $480 million business, is not a lot, but we were not short. I'll tell you to this day we were not short, but the books, everything was taken from us so we couldn't even prove it.

*Fifth*, Castillero has stated that he was targeted by the Securities and Exchange Commission and by this Office because of his political beliefs and affinity for President Trump. For example, from Cowboy Logic[12]:

---

[8] https://www.youtube.com/watch?v=-SkU76jaJv4

[9] https://rumble.com/v75l1v2-targeted-by-lawfare.html.

[10] https://rumble.com/v75jt42-late-night-return-and-the-fractures-are-appearing-in-your-country.html.

[11] https://rumble.com/v75jt42-late-night-return-and-the-fractures-are-appearing-in-your-country.html.

[12] https://rumble.com/v72ad8s-cowboy-logic-112925-michael-castillero.html.

- At 5:45:
  - Interviewer: To your investors, you made them a lot of money. But I think that obviously made you a target:
  - Castillero: Target, Republican donations, Trump-organization events, social media posts about election robbery and so on—... they saw every Biden's an idiot post, the election is stolen post between me and my wife. I mean, I mean you know COVID like most people opened our eyes and took us down the rabbit hole of us basically reposting and doing things of that sort that made them, made us a target.
  - Interviewer: And I'm sure I'm sure they used all that social media posts in your trial, am I correct?
  - Castillero: They did, absolutely. They cherry picked the ones that they wanted to use.
- At 8:38: Castillero: I worked so hard to build such a good business and for having political beliefs I feel like I've been punished to the point that I'm going to lose everything. I'm going to lose everything and then the government is still trying to take it away from me on top of it.
- At 16:11:
  - Interviewer: You were targeted because of your beliefs.
  - Castillero: Yes.
- At 18:29: Castillero: They did it to me just because of my beliefs. I believe the 2020 election was stolen. I've been very vocal of it. I moved to Florida. I wanted to be around people like myself, by frequenting Trump properties and so on. I even went to the announcement – I mean you can name it when he announced he was running again. They're doing it to me because of my beliefs. They're doing it daily.

Similarly, on Diamond and Silk[13]:

- At 14:33: Castillero: ... Big Trump supporters, successful business owners, and some judge, somewhere in the country found a reason to try to take our business from us, just based on our beliefs. It's the blueprint.
- At 15:45: Castillero: In 2021, when the election was stolen, in 2020 to 21, they just changed all the rules, they just decided to come after us for absolutely no reason whatsoever, other than you pulled up my Instagram my wife's Instagram, we were having dinner at a Mar-a-Lago, or we were posting like those dumb memes, like Happy Fourth of July on Easter from Biden, and the, you know, Let's go Brandon [crosstalk].

[13] https://rumble.com/v75l1y2-targeted-by-lawfare.html.

On Battlefront[14]:

- At 1:17:55: Castillero: We were doing things by the book. For all of a sudden, because all three of us were Republican, and posting on social media about how Biden's an idiot, and all these - bunch of things, and that's why they took us, and that's why they came after us. Cause there's other funds like mine still operating, they just don't speak their beliefs, or they may even give money to the other side.

These statements are all false. Castillero's political beliefs have been at all times irrelevant to this prosecution. Castillero was investigated and prosecuted for defrauding his investors. Castillero admitted to defrauding investors in his proffers and a jury subsequently convicted him of doing so.

*Sixth*, and similarly, Castillero has stated that the "rules" governing the securities industry changed after the change in administration in 2021 such that Castillero's previously lawful conduct was suddenly deemed unlawful.

- Cowboy Logic at 4:27[15]: Castillero: And then 2021 comes around. And all of a sudden rules change. People are leaving—administration changes. And all of a sudden—us as an exempt reporting adviser, which means that we just basically had to report what we were doing, how the investments were being managed. But we were being ultra compliant just because one of my business partners was a compliance person and she wanted to be ultra compliant, above and beyond. So they decided on that, on voluntary information that we provided, to build a case to take the company from us, and two years later indict us criminally as well.
- *Id.* at 16:56: Castillero: All the charges are 25 years, just because he just chose to change the rules at the 1 yard line, basically. It's absurd.

Again, this is false. As the trial evidence showed, the rules that the defendants violated—the antifraud provisions of Title 15 and Title 18, and the rules governing charging and disclosing fees to investors, including markups—have been substantially the same for decades, and certainly since the defendant took his securities licensing exams.

*Seventh*, Castillero has stated that the Government threatened him with denaturalization during the process of his attempted cooperation. On Steel News, at 8:47:[16]

- Interviewer: Did you sign a proffer or a cooperation agreement?

---

14 https://rumble.com/v75jt42-late-night-return-and-the-fractures-are-appearing-in-your-country.html.

15 https://rumble.com/v72ad8s-cowboy-logic-112925-michael-castillero.html

16 https://www.youtube.com/watch?v=am1UeeoOnho&list=FLIFZ5mTVgJijAHdxAC-gtgA&index=2.

- Castillero: Yes, when they threatened to uh, they threatened to uh, denaturalize me as an American citizen.
- Interviewer: Wow, was that agreement in writing?
- Castillero: Yeah but I refused to sign it at the end because they lied to me. The DOJ lied to me.
- Interviewer: All right, uh tell us about that lie, because I think that's really critical, and I'm going to bring Trennis in here in a second.
- Castillero: They brought me in. So so they threatened me to cooperate against my two business partners at the time. And I said, why? I didn't—We've done nothing wrong. And my lawyer at the time says, "Oh, Judge Furman can't wait to put you in jail." And I go, "What? What are you talking about?" And being that President Trump came in, we're using, we're looking to use um, we're looking to use some of those denaturalization laws. They know that you came here illegally and when you were 18 you became an American citizen and they're looking into denaturalizing you. And I was like, what? I've got a wife and two kids, you're looking to deport me now over this?

  So they brought me in. I did what I had to do. And they promised me something and they promised me that I'd be removed off the case and I'd be done and I could go live my life, which I what I wanted at that point. It'd been four years. And at the end, oh no no no, you've got to sign the forfeiture of everything that you own. Oh okay! I said you can tell them I'll see them in court. So they lied to me to try to get information out of me, which they didn't, which they couldn't.

Similarly, on Diamond and Silk, at 34:12[17]:

- Interviewer: I understand something happened that they wanted to denaturalize you.
- Castillero: … After the news of Judge Furman blocking the Mahmoud Khalil deportation, I get a phone call from my lawyer that the AUSAs want to denaturalize me under the same rules President Trump had. That they used the same rules that they used to block that deportation, that they're going to use the same rules to denaturalize me and deport me. And my lawyer said came, called me to tell me, that's what the Southern District of New York lawyers told her.

On April 30, 2026, Castillero also publicly posted on the social media platform X, replying to a post by U.S. Pardon Attorney Edward R. Martin, Jr.: "SDNY lying AUSA's Allison Nichols, Adam Hobson, Matt Shahabian they've threatened with denaturalisation, and have lied on and off the record multiple times and I have the receipts."[18]

---

[17] https://rumble.com/v75l1v2-targeted-by-lawfare.html.

[18] https://x.com/mikec0921/status/2049814580923126178.

This is false. At no point did any AUSA associated with this case threaten to denaturalize or deport the defendant. To the extent Castillero or his attorney was referring to the boilerplate language in the standard cooperation agreement the Office extended to Castillero on March 19, 2025, that language merely states the law on denaturalization applicable to *any* person,[19] and, indeed, the undersigned AUSAs were not personally aware of the defendant's immigration status or the circumstances of his naturalization at the time they extended that agreement.

*Eighth*, Castillero has claimed to have spent between $5 and $7 million on his criminal defense, despite having appointed counsel since December 2023. For example, on the Truth with John Gordon, at 14:49:[20]

- Interviewer: How much did you spend on your defense?
- Castillero: Millions of dollars. Probably $5 to $7 million.

*Ninth*, Castillero has falsely claimed that this Court has worked with the Government to unfairly prosecute the defendant by directing the jury to return a verdict against him, intimating this is either due to his political beliefs or, as part of a plan to steal his business, for which he

---

[19] That language reads:

The defendant recognizes that, if the defendant is not a citizen of the United States, the defendant's guilty plea and conviction make it very likely that the defendant's removal from the United States is presumptively mandatory and that, at a minimum, the defendant is at risk of being removed or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, the defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. Under federal law, an individual may be subject to denaturalization and removal if the defendant's naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that the defendant has discussed the possible immigration consequences (including removal or denaturalization) of the defendant's guilty plea and conviction with defense counsel. The defendant affirms that the defendant wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including the defendant's attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw the defendant's guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge the defendant's conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the defendant's guilty plea and conviction.

[20] https://www.youtube.com/watch?v=-SkU76jaJv4.

accuses Judge Kaplan of complicity through a corrupt arrangement with the Receiver to loot StraightPath. For example:

- Cowboy Logic, at 14:26: Castillero: [The Government] is leaving with their tail between their legs, they're being proven liars … Jesse Furman was basically a fourth lawyer for the prosecution.[21]
- *Id.* at 21:30: Castillero: This is a money grab all the way across, I've said it from day one. They wanted to steal our business. And the Receiver, who is Judge Kaplan's friend, that's what I say all the time whether they are or they're not because Judge Kaplan—we gave him a list of three receivers to give the company to, including one that was connected to our accountant that had all our books, and the securities and exchange commission gave them a uh, gave them three receivers to give to, Judge Kaplan just said, "No, screw you, I'm going to appoint my own person." And you know, Bill Clinton, Clinton-appointed Judge Kaplan, the Receiver has made probably about $30, over $30 million dollars, I think, that's the number that we had. And they're pocketing the money. And we've had another 4 or 5 companies go public, some are up 4x from when the company went public from when the customers invested in, and they're causing customer losses, which is another thing that bothers me.
- The Truth with John Gordon, at 4:57[22]: Castillero: So at the end of all that, the judge, Judge Jesse Furman, who wouldn't uh, wouldn't uh, President Trump wanted to deport Mahmoud Khalil, the guy who was protesting Columbia University, one of the first ones, he's the one that blocked it. Once jury instructions came, basically, said, you know, you should look at, you should basically try them as an investment adviser, which we weren't.
- *Id.* at 13:46:
    - Castillero: The jury deliberated in four hours because Judge Furman basically told them to deliberate a certain way.
    - Interviewer: So you had to oppose the prosecutor and the judge it sounds like.
    - Castillero: Absolutely. Think about 20, out of the 25 judges in the Southern District of New York, 20 are Democrat. 80% of the draw in that District is Democrat. And I'm dealing with Judge Kaplan in the civil case who is a Clinton-appointed judge, and then you have Furman who is an Obama-appointed judge.
    - Interviewer: So what did the jury say?
    - Castillero: The jury? They jury deliberated in four hours and we were guilty on all counts because he told them---mid mid through the deliberation they asked can you define again what the Investment Adviser Act is, and then two hours later they basically came in and said we were guilty on all charges because they were instructed to charge us a certain way.

---

[21] https://rumble.com/v72ad8s-cowboy-logic-112925-michael-castillero.html.

[22] https://www.youtube.com/watch?v=-SkU76jaJv4

- Steel News, at 6:28[23]:
  - Interviewer: Was this a jury verdict or was it a plea?
  - Castillero: It was a jury verdict that Judge Jesse Furman changed at the last second, he changed the … when the charging instructions came through, he basically threw a wrench at the last second, try them as investment advisors, which we clearly weren't, we are a PreIPO fund and an exempt reporting adviser. And he basically threw that wrench right in there, and once you tell them to charge as investment advisers, obviously they're going to with that route. It took them like four hours to come with that, you know, the judge was basically a fourth lawyer for the prosecution.
- Diamond and Silk[24]:
  - At 17:16: Castillero: By late 2021, they were just, they were making up a whole slew of lies against us, by May of 22 they took the company from us, calling us a Ponzi-like scheme. Right, now you're either a Ponzi scheme or you're not. To this day the company is still operating, on who? Judge Lewis Kaplan, who we both know President Trump has had a lot of problems with, took the company and gave it to a receiver, which I call his friend, the company has generated $20-30 million in revenue.
  - At 24:42: Castillero: Our judge on that case was Judge Jesse Furman, which I think President Trump had a problem with him when he was trying to do the first round of deportations, when he first came into office this time, this go around. And uh, right at the end, our purpose of the whole trial was to defuse that we were investment advisers and we did, and at the end, he goes, just charge them as investment advisers, tells the jury that. So what happens, they go in the room, they're out in two hours, or three hours, or four hours, and that's it, like, it's unbelievable. The judge is just basically helping out the prosecutors.
  - At 47:10:
    - Castillero: It's not being distributed [by the Receiver], it's being kept, it's being kept to cover fees.
    - Interviewer: And it's the fees that they're charging themselves?
    - Castillero: Yes. Fees that we would have, fees that we would have made on making, if we would have made, our money would have made predicated on the customer's return. They just charging fees, because they all gotta take care of themselves.

---

23 https://www.youtube.com/watch?v=am1UeeoOnho&list=FLIFZ5mTVgJijAHdxAC-gtgA&index=.

24 https://rumble.com/v75l1y2-targeted-by-lawfare.html.

- Battlefront, at 1:38:40[25]: Castillero: The judge is just there to, he's like John Stockton for the AUSAs, he's just throwing them layups all day long. When it comes to the jury instructions, four of the charges are investment adviser charges. We crushed those charges. The judge basically goes like this like, eh you know what forget what you heard, basically, forget what you heard, charge them as investment advisers. So two weeks, two and a half weeks, [unintelligible].

*Tenth*, Castillero has falsely asserted that the Government has lied and acted with improper motives in this investigation and prosecution:

- Truth with John Gordon, at 12:56[26]: Castillero: On top of it, they were already launching a sham investigation into us so I'm sure they found a way to shove a square peg into a round hole, they're going to keep finding a way to do it.
- *Id.* at 16:06: Castillero: I can tell you firsthand, they found, they worked so hard to create their own, to build a story to make up their own truth, out of even facts that they had fabricated.
- People's Tribute Council Alert: Michael Castillero, December 31, 2025 at 2:10[27]: Castillero: They took voluntary information to build basically a case against us to take the company from us and then after that they followed up to build a criminal case because we were getting testy with them.
- Diamond and Silk, at 22:45[28]: Castillero: We kind of got wind that they [the SEC] were communicating with the Department of Justice, the Southern District of New York, to criminally, our lawyers want that information, they say, you ask for that information again we're going to charge you, and my lawyers are like, for what? So I think one of my lawyers pried a little bit too much, kept poking the bear … Thursday after Thanksgiving at 11 o'clock at night I get a phone call that I have to be in New York because I was being indicted on investment adviser fraud, securities fraud, and all these things that they made up out of nowhere… They just create so much crap to make things up.

*Eleventh*, in Martinsen's one appearance with Castillero on The Case for America on December 6, 2025,[29] Martinsen falsely claimed that investors were losing money because of the Receiver's actions that StraightPath would not have caused them losses, giving the examples of Airbnb and Rubrik, at 7:38:

---

25 https://rumble.com/v75jt42-late-night-return-and-the-fractures-are-appearing-in-your-country.html.

26 https://www.youtube.com/watch?v=-SkU76jaJv4.

27 https://www.youtube.com/watch?v=3aQi64J19B8.

28 https://rumble.com/v7511v2-targeted-by-lawfare.html.

29 The Case For America, RealAmericasVoice, https://rumble.com/v72or6u-the-case-for-america.html (Dec. 6, 2025).

- Martinsen: I can give you a clear example on two companies, one that we handled and one that the Receivership handled and how it played out. AirBnb was a company that we had in the Fund that we had investors in, the investors made about 100% on their money. The fund received 20% back end fee on the profit. So on 100% gain, the client if he put in $100,000, made back $180,000 because we got $20 of the $100 on the profit.
  Another company that became public after the Receiver took over was Rubrik. Rubrik the average cost to our customers was around $33 per share. The Receivership sold the stock after the IPO at 70, so let's call that roughly 100% profit. From the clients that I've heard from, they didn't receive even half of their original investment back. So with us, if a client put in $180,000, I mean $100,000, they would have received back roughly $180,000. With the Receiver, it appears that they received back between a third and half of their original investment. So if you put in $100,000, they only received back roughly $30/$40,000. As opposed to if we were running the company it would have been roughly $180,000.

Of course, Martinsen's explanation is essentially the fraud repeated. Martinsen omits that he and his co-defendants hid massive markups from Airbnb investors that siphoned large amounts of money from the investors' investment in Airbnb to StraightPath—and to Martinsen's pockets. (GX 1001). Moreover, Martinsen's explanation of the Rubrik examples again omits the 32% average undisclosed markup he and his co-defendants charged investors, as well as the Receiver's attempt to unwind the Funds by accounting for share shortfalls in Rubrik, poor recordkeeping, and unfairly distributed markups. (*See* GX 1030, 1036).

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York

By: /s/
Allison Nichols
Adam S. Hobson
Matthew R. Shahabian
Assistant United States Attorneys
Southern District of New York
(212) 637- 2366 / 2484 / 1046

Cc: Counsel of record (by ECF)

Enclosures

# EXHIBIT C

# Shopper Info for Shopper ID 155854440

| | |
|---|---|
| Shopper ID: | 155854440 |
| Private Label ID: | 1 |
| Login Name: | admin@straightpathvp.com |
| First Name: | Michael |
| Last Name: | Castillero |
| Company: | |
| Address1: | 601 Heritage Drive Suite 220 |
| Address2: | |
| City: | Jupiter |
| State/Prov: | FL |
| Postal Code: | 33458 |
| Country: | US |
| Phone Work: | +1.7033405914 |
| Phone Home: | |
| Mobile: | +1.7033405914 |
| Fax: | |
| Email: | admin@straightpathvp.com |
| Date Created: | 5/5/2017 12:54:02 PM |
| Last Changed By Date: | 8/8/2022 8:26:16 AM |
| Fraud: | Verified by Fraud Dept - Customer OK |
| Twitter Handle: | |

# Domain List - All for Shopper ID 155854440

| Domain Name | Status | Created | Expires | Order ID |
|---|---|---|---|---|
| straightpathvp.com | 0 Active | 10/24/2017 | 10/24/2025 | 1207914199 |
| straightpathventurepartners.com | 0 Active | 10/24/2017 | 10/24/2027 | 1207914199 |

# Domain Information for Shopper ID 155854440

| | |
|---|---|
| Shopper ID: | 155854440 |
| Domain Name: | straightpathvp.com |
| Registrar: | GoDaddy.com, LLC |
| Registration Period: | 8 |
| Create Date: | 10/24/2017 6:21:48 PM |
| Expiration Date: | 10/24/2025 6:21:48 PM |
| Update Date: | 8/12/2019 9:33:31 AM |
| Transfer Away Eligibility Date: | |
| Status: | 0 Active |
| Is Certified Domain: | False |
| Gaining Registrar Name: | GoDaddy.com, LLC |
| Transferred Away Date: | |
| Last Modified: | 7/15/2022 11:25:57 AM |
| Custom DNS: | Yes |
| Name Servers: | ns43.domaincontrol.com<br>ns44.domaincontrol.com |
| Auto Renew: | Yes |
| Renew Period: | 0 |

## Registrant Contact

| | |
|---|---|
| Name: | Registration Private |
| Company: | Domains By Proxy, LLC |
| Email: | straightpathvp.com@domainsbyproxy.com |
| Address 1: | DomainsByProxy.com |
| Address 2: | 2155 E Warner Rd |
| City: | Tempe |
| State/Province: | Arizona |
| Postal Code: | 85284 |
| Country: | United States |
| Phone: | +1.4806242599 |
| Fax: | +1.4806242598 |
| Modify Time: | 10/7/2019 7:55:06 PM |

## Technical Contact

| | |
|---|---|
| Name: | Registration Private |
| Company: | Domains By Proxy, LLC |
| Email: | straightpathvp.com@domainsbyproxy.com |
| Address 1: | DomainsByProxy.com |
| Address 2: | 2155 E Warner Rd |
| City: | Tempe |
| State/Province: | Arizona |
| Postal Code: | 85284 |
| Country: | United States |
| Phone: | +1.4806242599 |
| Fax: | +1.4806242598 |
| Modify Time: | 10/7/2019 7:55:06 PM |

## Administrative Contact

| | |
|---|---|
| Name: | Registration Private |
| Company: | Domains By Proxy, LLC |
| Email: | straightpathvp.com@domainsbyproxy.com |
| Address 1: | DomainsByProxy.com |
| Address 2: | 2155 E Warner Rd |
| City: | Tempe |
| State/Province: | Arizona |
| Postal Code: | 85284 |
| Country: | United States |
| Phone: | +1.4806242599 |
| Fax: | +1.4806242598 |
| Modify Time: | 10/7/2019 7:55:06 PM |

## Billing Contact

| | |
|---|---|
| Name: | Registration Private |
| Company: | Domains By Proxy, LLC |
| Email: | straightpathvp.com@domainsbyproxy.com |
| Address 1: | DomainsByProxy.com |
| Address 2: | 2155 E Warner Rd |
| City: | Tempe |
| State/Province: | Arizona |
| Postal Code: | 85284 |
| Country: | United States |
| Phone: | +1.4806242599 |
| Fax: | +1.4806242598 |
| Modify Time: | 10/7/2019 7:55:06 PM |

# Notes for Shopper ID 155854440
## 1/1/2017 to 8/26/2022

| Entered Date / By | Note |
|---|---|
| 6/3/2021 6:03:45 AM / workspaceservices.prod.client.int.godaddy.com / Client IP: GoDaddy Internal | New contact.address.address2: "" \| contact.address.state Old: "NY", New: "FL" \| New contact.phoneHome: "" \| New contact.fax: "" |
| 6/3/2021 6:03:18 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | Customer's address is not supported by Microsoft for O365: StateZipCityInvalid - Details: Address field invalid for property: 'Province' |
| 6/3/2021 6:02:22 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | Customer's address is not supported by Microsoft for O365: StateZipCityInvalid - Details: Address field invalid for property: 'Province' |
| 6/3/2021 5:59:47 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to set mailbox: admin@straightpathvp.com as admin by (155854440) |
| 6/3/2021 5:58:58 AM / Customer / Client IP: ::ffff:10.114.34.113 | Email & Office (Manage All) account accessed |
| 6/2/2021 1:31:00 PM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to update Office365 password for email address: admin@straightpathvp.com by (155854440) |
| 6/2/2021 1:30:32 PM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to update Office365 password for email address: malejandro@straightpathvp.com by (155854440) |
| 6/2/2021 6:27:26 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to update Office365 password for email address: fundadmin@straightpathvp.com by (155854440) |
| 6/2/2021 6:25:25 AM / Customer / Client IP: ::ffff:10.114.35.234 | Email & Office (Manage All) account accessed |
| 6/1/2021 12:56:32 PM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to update Office365 password for email address: fundadmin@straightpathvp.com by (155854440) |
| 6/1/2021 12:55:13 PM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to update Office365 password for email address: flanaia@straightpathvp.com by (155854440) |
| 6/1/2021 12:54:22 PM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to update Office365 password for email address: bmartinsen@straightpathvp.com by (155854440) |
| 6/1/2021 8:36:16 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to update Office365 password for email address: info@straightpathvp.com by (155854440) |
| 6/1/2021 8:35:31 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to update Office365 password for email address: mmachado@straightpathvp.com by (155854440) |
| 5/5/2021 1:35:54 PM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to remove mailbox with email address: gabrielm@straightpathvp.com from account: 9f30396d-d466-11e7-8110-3417ebe725c2 by (155854440) |
| 5/5/2021 10:00:24 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to remove mailbox with email address: aguarino@straightpathvp.com from account: f782c5b7-e918-11e9-81a0-3417ebe73f0e by (155854440) |
| 5/5/2021 10:00:14 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to remove mailbox with email address: mfredricks@straightpathvp.com from account: 9ca9e054-44aa-11e8-8129-3417ebe7253b by (155854440) |
| 5/5/2021 9:59:54 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to remove mailbox with email address: mmcginley@straightpathvp.com from account: 6be81c05-e919-11e9-81a7-3417ebe60eb6 by (155854440) |
| 5/5/2021 9:56:46 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to remove mailbox with email address: fvecchio@straightpathvp.com from account: a0209100-baac-11e8-814a-3417ebe725e0 by (155854440) |
| 5/5/2021 9:56:36 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to remove mailbox with email address: shollender@straightpathvp.com from account: e07b3942-c8b5-11e7-8107-3417ebe724ff by (155854440) |
| 5/5/2021 9:56:16 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to remove mailbox with email address: gdurand@straightpathvp.com from account: a90e802c-c80e-11e9-8198-3417ebe73f0e by (155854440) |
| 5/5/2021 9:55:12 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to remove mailbox with email address: ablanc@straightpathvp.com from account: 4061bc92-94e6-11e8-813e-3417ebe73f0e by (155854440) |

# Notes for Shopper ID 155854440
## 1/1/2017 to 8/26/2022

| Entered Date / By | Note |
|---|---|
| 5/5/2021 7:50:47 AM / Customer / Client IP: browser | contact.address.address1 Old: "25 Broadway 9th Floor", New: "601 Heritage Drive Suite 220" \| New contact.address.address2: "" \| contact.address.city Old: "New York", New: "Jupiter" \| contact.address.postalCode Old: "10004", New: "33458" \| New contact.organization: "" \| New contact.phoneWorkExtension: "" \| New contact.phoneHome: "" \| New contact.fax: "" \| New preference.currency: "USD" |
| 4/22/2021 7:54:35 AM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to change mailbox. previous: brianmartinsen@straightpathvp.com, current: fundadmin@straightpathvp.com. by (155854440) |
| 4/6/2021 2:50:35 PM / WorkspaceProvisioning / Client IP: GoDaddy Internal | request submitted to change mailbox. previous: imasi@straightpathvp.com, current: jstern@straightpathvp.com. by (155854440) |
| 4/6/2021 2:46:46 PM / Customer / Client IP: ::ffff:10.114.35.233 | Domains (Manage All) account accessed |
| 4/6/2021 6:46:46 AM / Customer / Client IP: ::ffff:10.114.35.154 | websiteSecurity: Website Security - Standard - 1 year(s) (518761634) (cb0a457d-96db-11eb-820e-3417ebe72595) entered account |
| 4/6/2021 6:31:31 AM / Customer / Client IP: ::ffff:10.114.34.46 | domains: .COM Domain Registration (361797135) (254754941) entered account |
| 4/6/2021 6:27:13 AM / pci.eCommClient.prod.intranet.gdg / Client IP: GoDaddy Internal | New preference.marketId: "en-US" |
| 4/6/2021 6:22:22 AM / Customer / Client IP: ::ffff:10.114.35.198 | websiteSecurity: Website Security Basic (490458480) (982d531a-f30c-11ea-8216-3417ebe73f23) entered account |
| 4/6/2021 6:21:21 AM / Customer / Client IP: ::ffff:10.114.35.198 | domains: .COM Domain Registration (361797134) (254754942) entered account |
| 4/6/2021 6:17:04 AM / pci.eCommClient.prod.intranet.gdg / Client IP: GoDaddy Internal | New preference.marketId: "en-US" |
| 4/6/2021 6:09:09 AM / Customer / Client IP: ::ffff:10.114.35.198 | domains: .COM Domain Registration (361797134) (254754942) entered account |
| 4/5/2021 5:59:00 PM / Auth Platform / Client IP: GoDaddy Internal | 2FA: Shopper 155854440 added a new default SMS factor ***-***-0773 |
| 3/13/2021 7:47:24 AM / pci.eCommClient.prod.intranet.gdg / Client IP: GoDaddy Internal | New preference.marketId: "en-US" |
| 3/13/2021 6:10:34 AM / gdBAEmail.Email / Client IP: GoDaddy Internal | Failure Email sent to: malejandro@straightpathvp.com for Product Name Next Billing Date Qty Price ---------- ---------------- --- --------- Email Plus From GoDaddy - Renewal - 1 year 3/20/2021 1 $83.88 Billing for 03/13/2021. admin@straightpathvp.com |
| 3/13/2021 6:10:33 AM / BillingAgent / Client IP: GoDaddy Internal | Failed Billing Attempt (Partner Email): 1. Next Attempt Date: Mar 20 202 Reason: Payment request was declined. Account: Billing for 03/13/2021. admin@straightpathvp.com |
| 3/4/2021 12:03:22 PM / gdBAEmail.Email / Client IP: GoDaddy Internal | AutoRenewOff Email Sent to: malejandro@straightpathvp.com for Product Name Next Attempt Date ---------- ---------------- Email Plus From GoDaddy - Renewal - 1 year CANCELLED Billing for 02/12/2021. New Account Email Plus From GoDaddy - Renewal - 1 year CANCELLED Billing for 02/12/2021. New Account Email Plus From GoDaddy - Renewal - 1 year CANCELLED Billing for 02/12/2021. New Account Email Plus From GoDaddy - Renewal - 1 year CANCELLED Billing for 02/12/2021. New Account Email Plus From GoDaddy - Renewal - 1 year CANCELLED Billing for 02/12/2021. New Account Email Plus From GoDaddy - Renewal - 1 year CANCELLED Billing for 02/12/2021. New Account |
| 3/4/2021 12:03:21 PM / BillingAgent / Client IP: GoDaddy Internal | Failed Billing Attempt: 3. Cancelling Partner Email. Reason: Autorenew is off. Account: Billing for 02/12/2021. New Account |

# Office365 ShopperId 155854440

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| jmediate@straightpathvp.com | delete | Jason Mediate | Jason Mediate | USA | 10/25/2017 8:38:01 PM | 10/1/2018 3:08:55 PM |

# Account Details for AccountID: 12500751

| | |
|---|---|
| Account Status: | Setup |
| Orion Account Status: | setup |
| Country Code for Billing: | us |
| Created Date (UTC): | 10/24/2017 11:30:08 PM |
| Last Modified Date (UTC): | 10/15/2021 2:54:41 PM |
| Subscription: | EP1 |
| Description: | Microsoft 365 Email Plus From GoDaddy |

# Mailboxes for AccountID: 12500751

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| malejandro@straightpathvp.com | setup | Michael Alejandro | Michael Alejandro | USA | 10/25/2017 8:39:38 PM | 9/28/2021 10:14:58 PM |

# Account Details for AccountID: 12626152

| | |
|---|---|
| Account Status: | Setup |
| Orion Account Status: | setup |
| Country Code for Billing: | us |
| Created Date (UTC): | 11/13/2017 9:02:00 PM |
| Last Modified Date (UTC): | 10/15/2021 2:54:41 PM |
| Subscription: | EP1 |
| Description: | Microsoft 365 Email Plus From GoDaddy |

# Mailboxes for AccountID: 12626152

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| shollender@straightpathvp.com | delete | Scott Hollender | Scott Hollender | USA | 11/13/2017 9:15:13 PM | 12/19/2017 6:37:07 PM |
| scotthollender@straightpathvp.com | delete | Scott Hollender | Scott Hollender | USA | 12/19/2017 6:39:01 PM | 12/19/2017 8:55:29 PM |
| shollender@straightpathvp.com | delete | Scott Hollender | Scott Hollender | USA | 12/19/2017 8:57:36 PM | 5/5/2021 4:57:44 PM |
| brianm@straightpathvp.com | setup | Brian Martinsen | Brian Martinsen | USA | 6/4/2021 9:01:36 PM | 4/26/2022 4:27:39 PM |

# Account Details for AccountID: 12626153

| | |
|---|---|
| Account Status: | Setup |

# Office365 ShopperId 155854440

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| almak@straightpathvp.com | delete | Al Mak | Al Mak | USA | 11/28/2017 9:42:32 PM | 12/19/2017 8:55:03 PM |
| amak@straightpathvp.com | delete | Al Mak | Al Mak | USA | 12/19/2017 8:56:33 PM | 8/9/2018 3:06:22 PM |
| dfurina@straightpathvp.com | delete | Dominic Furina | Dominic Furina | USA | 8/13/2018 3:16:53 PM | 1/16/2019 7:17:50 PM |
| tsison@straightpathvp.com | delete | Thomas Sison | Thomas Sison | USA | 1/24/2019 7:37:48 PM | 8/27/2019 2:34:09 PM |
| ltaylor@straightpathvp.com | delete | Luke Taylor | Luke Taylor | USA | 8/29/2019 8:45:26 PM | 9/3/2019 6:48:29 PM |
| smurtada@straightpathvp.com | delete | Somar Murtada | Somar Murtada | USA | 9/9/2019 5:28:16 PM | 9/10/2019 5:34:33 PM |
| czimmerman@straightpathvp.com | delete | Christian D. Zimmerman | Christian D. Zimmerman | USA | 9/26/2019 5:58:26 PM | 12/31/2019 3:29:36 AM |
| miacono@straightpathvp.com | delete | Mark Iacono | Mark Iacono | USA | 1/21/2020 4:27:48 PM | 10/2/2020 7:46:03 PM |
| backoffice@straightpathvp.com | setup | SPVP Backoffice | SPVP Backoffice | USA | 6/3/2021 1:03:55 PM | 6/3/2021 3:12:23 PM |

## Account Details for AccountID: 12714240

| | |
|---|---|
| Account Status: | Deleted |
| Orion Account Status: | removed |
| Country Code for Billing: | US |
| Created Date (UTC): | 11/28/2017 6:04:49 PM |
| Last Modified Date (UTC): | 12/18/2021 6:58:14 PM |
| Subscription: | B2 |
| Description: | Microsoft 365 Business Professional From GoDaddy |

## Mailboxes for AccountID: 12714240

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| bbanks@straightpathvp.com | delete | C. Branford Banks | C. Branford Banks | USA | 11/28/2017 9:52:32 PM | 12/26/2017 2:35:57 PM |
| mquiles@straightpathvp.com | delete | Michael Quiles III | Michael Quiles III | USA | 12/26/2017 5:40:41 PM | 12/27/2017 5:15:31 PM |
| mquiles@straightpathvp.com | delete | Michael Quiles III | Michael Quiles III | USA | 12/27/2017 5:18:45 PM | 1/19/2018 6:48:19 PM |
| gmigliano@straightpathvp.com | delete | Gabriel Migliano | Gabriel Migliano | USA | 3/15/2018 7:26:12 PM | 11/13/2019 3:57:17 PM |
| gabrielm@straightpathvp.com | delete | Gabriel Migliano | Gabriel Migliano | USA | 11/13/2019 3:58:38 PM | 5/5/2021 8:37:00 PM |

## Account Details for AccountID: 13751277

| | |
|---|---|
| Account Status: | Deleted |

# Office365 ShopperId 155854440

Orion Account Status: removed
Country Code for Billing: US
Created Date (UTC): 4/20/2018 2:53:50 PM
Last Modified Date (UTC): 5/10/2022 10:50:45 PM
Subscription: B2
Description: Microsoft 365 Business Professional From GoDaddy

## Mailboxes for AccountID: 13751277

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| mlopez@straightpathvp.com | delete | Michael Lopez | Michael Lopez | USA | 4/20/2018 3:03:32 PM | 11/13/2019 7:36:06 PM |
| mfredricks@straightpathvp.com | delete | Matthew Fredricks | Matthew Fredricks | USA | 12/2/2019 8:53:10 PM | 5/5/2021 5:00:20 PM |

## Account Details for AccountID: 13849654

Account Status: Setup
Orion Account Status: setup
Country Code for Billing: US
Created Date (UTC): 5/3/2018 4:15:25 PM
Last Modified Date (UTC): 5/16/2022 5:43:14 PM
Subscription: EP1
Description: Microsoft 365 Email Plus From GoDaddy

## Mailboxes for AccountID: 13849654

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| mgenovese@straightpathvp.com | delete | Michael Genovese | Michael Genovese | USA | 5/3/2018 4:17:10 PM | 3/5/2020 8:27:58 PM |
| rsavage@straightpathvp.com | setup | R Savage | R Savage | USA | 6/17/2020 8:49:49 PM | 5/16/2022 5:43:05 PM |

## Account Details for AccountID: 14138379

Account Status: Initial
Orion Account Status: initializeaccount
Country Code for Billing: US
Created Date (UTC): 6/12/2018 8:08:08 PM
Last Modified Date (UTC): 5/16/2022 5:43:04 PM
Subscription: EP1
Description: Microsoft 365 Email Plus From GoDaddy

## Mailboxes for AccountID: 14138379

# Office365 ShopperId 155854440

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| ablanc@straightpathvp.com | delete | Alex Blanc | Alex Blanc | USA | 7/31/2018 5:25:12 PM | 5/5/2021 4:56:07 PM |

# Account Details for AccountID: 14557227

| | |
|---|---|
| Account Status: | Deleted |
| Orion Account Status: | removed |
| Country Code for Billing: | US |
| Created Date (UTC): | 8/13/2018 3:18:41 PM |
| Last Modified Date (UTC): | 9/2/2020 1:36:29 PM |
| Subscription: | EP1 |
| Description: | Microsoft 365 Email Plus From GoDaddy |

# Mailboxes for AccountID: 14557227

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| jhickey@straightpathvp.com | delete | John Hickey | John Hickey | USA | 8/13/2018 3:54:28 PM | 1/28/2019 8:39:29 PM |
| manthony@straightpathvp.com | delete | Michael Anthony | Michael Anthony | USA | 2/8/2019 7:11:54 PM | 6/20/2019 6:13:27 PM |
| gdeguruceaga@straightpathvp.com | delete | Gonzalo De Guruceaga | Gonzalo De Guruceaga | USA | 6/25/2019 5:10:13 PM | 1/14/2020 4:06:30 PM |
| rtannenbaum@straightpathvp.com | delete | Ryan Tannenbaum | Ryan Tannenbaum | USA | 2/5/2020 4:51:26 PM | 2/24/2020 4:48:57 PM |

# Account Details for AccountID: 14675034

| | |
|---|---|
| Account Status: | Deleted |
| Orion Account Status: | removed |
| Country Code for Billing: | US |
| Created Date (UTC): | 8/29/2018 1:55:48 PM |
| Last Modified Date (UTC): | 9/18/2020 6:41:56 PM |
| Subscription: | EP1 |
| Description: | Microsoft 365 Email Plus From GoDaddy |

# Mailboxes for AccountID: 14675034

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| dnissan@straightpathvp.com | delete | Daniel Nissan | Daniel Nissan | USA | 8/29/2018 1:57:34 PM | 4/16/2019 1:28:10 AM |
| rcuillo@straightpathvp.com | delete | Robert Cuillo | Robert Cuillo | USA | 6/10/2019 3:52:12 PM | 6/10/2019 3:55:44 PM |

# Office365 ShopperId 155854440

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| rcuillo@straightpathvp.com | delete | Robert Cuillo | Robert Cuillo | USA | 6/10/2019 3:57:25 PM | 2/25/2020 5:44:57 PM |

## Account Details for AccountID: 14815441

| | |
|---|---|
| Account Status: | Deleted |
| Orion Account Status: | removed |
| Country Code for Billing: | US |
| Created Date (UTC): | 9/17/2018 7:05:24 PM |
| Last Modified Date (UTC): | 10/7/2021 10:43:15 AM |
| Subscription: | EP1 |
| Description: | Microsoft 365 Email Plus From GoDaddy |

## Mailboxes for AccountID: 14815441

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| nmazzola@straightpathvp.com | delete | Nikki Mazzola | Nikki Mazzola | USA | 9/17/2018 7:51:02 PM | 10/2/2018 4:36:44 PM |
| fvecchio@straightpathvp.com | delete | Frank Vecchio | Frank Vecchio | USA | 10/4/2018 1:44:28 PM | 5/5/2021 4:58:11 PM |

## Account Details for AccountID: 14886582

| | |
|---|---|
| Account Status: | Deleted |
| Orion Account Status: | removed |
| Country Code for Billing: | US |
| Created Date (UTC): | 9/26/2018 4:18:55 PM |
| Last Modified Date (UTC): | 10/16/2020 8:50:09 PM |
| Subscription: | EP1 |
| Description: | Microsoft 365 Email Plus From GoDaddy |

## Mailboxes for AccountID: 14886582

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| jthurnherr@straightpathvp.com | delete | Joseph Thurnherr | Joseph Thurnherr | USA | 9/26/2018 4:23:30 PM | 1/3/2019 5:26:36 PM |
| admin@straightpathvp.com | delete | brian martinsen | brian martinsen | USA | 12/7/2018 10:15:06 AM | 1/14/2019 7:15:08 PM |
| mnaro@straightpathvp.com | delete | Martin Naro | Martin Naro | USA | 1/31/2019 4:22:14 PM | 3/26/2019 4:08:25 PM |
| leor@straightpathvp.com | delete | Leor Yohanan (LPS Financial) | Leor Yohanan | USA | 4/9/2019 4:56:57 PM | 10/10/2019 2:51:04 PM |

# Office365 ShopperId 155854440

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| lcritchell@straightpathvp.com | delete | Laurence Critchell | Laurence Critchell | USA | 9/26/2019 6:01:07 PM | 1/14/2020 4:05:30 PM |
| zcochran@straightpathvp.com | delete | Zane Cochran | Zane Cochran | USA | 1/24/2020 7:48:52 PM | 2/24/2020 4:47:39 PM |

## Account Details for AccountID: 17709828

| | |
|---|---|
| Account Status: | Deleted |
| Orion Account Status: | removed |
| Country Code for Billing: | US |
| Created Date (UTC): | 8/26/2019 2:34:53 PM |
| Last Modified Date (UTC): | 9/15/2021 5:05:26 PM |
| Subscription: | EP1 |
| Description: | Microsoft 365 Email Plus From GoDaddy |

## Mailboxes for AccountID: 17709828

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| gdurand@straightpathvp.com | delete | Guy Durand | Guy Durand | USA | 8/26/2019 2:36:19 PM | 5/5/2021 4:56:21 PM |

## Account Details for AccountID: 18095605

| | |
|---|---|
| Account Status: | Deleted |
| Orion Account Status: | removed |
| Country Code for Billing: | US |
| Created Date (UTC): | 10/7/2019 3:41:53 PM |
| Last Modified Date (UTC): | 10/27/2021 12:29:31 PM |
| Subscription: | EP1 |
| Description: | Microsoft 365 Email Plus From GoDaddy |

## Mailboxes for AccountID: 18095605

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| anieves@straightpathvp.com | delete | Alexander Nieves | Alexander Nieves | USA | 10/7/2019 3:42:55 PM | 10/23/2019 5:01:53 PM |
| aguarino@straightpathvp.com | delete | Anthony Guarino | Anthony Guarino | USA | 11/5/2019 7:18:39 PM | 5/5/2021 5:01:28 PM |

## Account Details for AccountID: 18095623

| | |
|---|---|
| Account Status: | Deleted |
| Orion Account Status: | removed |

# Office365 ShopperId 155854440

Country Code for Billing: US
Created Date (UTC): 10/7/2019 3:43:30 PM
Last Modified Date (UTC): 10/27/2020 2:36:16 PM
Subscription: EP1
Description: Microsoft 365 Email Plus From GoDaddy

## Mailboxes for AccountID: 18095623

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| bcarrasquillo@straightpathvp.com | delete | Brandon Carr | Brandon Carrasquillo | USA | 10/7/2019 3:44:34 PM | 2/24/2020 4:52:57 PM |

## Account Details for AccountID: 18095638

Account Status: Deleted
Orion Account Status: removed
Country Code for Billing: US
Created Date (UTC): 10/7/2019 3:45:04 PM
Last Modified Date (UTC): 10/27/2021 12:29:31 PM
Subscription: EP1
Description: Microsoft 365 Email Plus From GoDaddy

## Mailboxes for AccountID: 18095638

| Email Address | Mailbox Status | Display Name | First/Last Name | Country Code | Create Date (UTC) | Last Modified Date (UTC) |
|---|---|---|---|---|---|---|
| jmurk@straightpathvp.com | delete | Jason Murk | Jason Murk | USA | 10/7/2019 3:46:20 PM | 10/23/2019 5:02:25 PM |
| wruzza@straightpathvp.com | delete | William Ruzza | William Ruzza | USA | 11/5/2019 8:29:53 PM | 11/13/2019 7:34:09 PM |
| mmcginley@straightpathvp.com | delete | Mike McGinley | Mike McGinley | USA | 11/27/2019 5:38:29 PM | 5/5/2021 5:01:25 PM |

## Account Details for AccountID: 18095656

Account Status: Deleted
Orion Account Status: removed
Country Code for Billing: US
Created Date (UTC): 10/7/2019 3:46:44 PM
Last Modified Date (UTC): 10/27/2020 2:36:16 PM
Subscription: EP1
Description: Microsoft 365 Email Plus From GoDaddy

## Mailboxes for AccountID: 18095656

# Shopper Contact Audit for Shopper ID 155854440

| Change Date | Requested By | IP Address | Value Changed | Previous Value | Changed To |
|---|---|---|---|---|---|
| 7/13/2022 7:46:35 AM | Shopper | browser | mobilePhone | +1.3476453001 | +1.7033405914 |
| 7/13/2022 7:46:35 AM | Shopper | browser | phone1 | +1.3476453001 | +1.7033405914 |
| 12/2/2021 7:05:59 AM | Shopper | browser | email | malejandro@straightpathvp.com | admin@straightpathvp.com |
| 6/3/2021 6:03:45 AM | workspaceservices.prod.client.int.godadd | GoDaddy Internal IP | state | NY | FL |
| 5/5/2021 7:50:47 AM | Shopper | browser | city | New York | Jupiter |
| 5/5/2021 7:50:47 AM | Shopper | browser | street1 | 25 Broadway 9th Floor | 601 Heritage Drive Suite 220 |
| 5/5/2021 7:50:47 AM | Shopper | browser | zip | 10004 | 33458 |
| 10/8/2019 8:16:40 AM | Shopper | 65.206.95.146 | city | hauppauge | New York |
| 10/8/2019 8:16:40 AM | Shopper | 65.206.95.146 | email | bmartinsen8@gmail.com | malejandro@straightpathvp.com |
| 10/8/2019 8:16:40 AM | Shopper | 65.206.95.146 | first_name | brian | Michael |
| 10/8/2019 8:16:40 AM | Shopper | 65.206.95.146 | last_name | martinsen | Castillero |
| 10/8/2019 8:16:40 AM | Shopper | 65.206.95.146 | phone1 | +1.6318389570 | +1.3476453001 |
| 10/8/2019 8:16:40 AM | Shopper | 65.206.95.146 | street1 | 14 stanley pl. | 25 Broadway 9th Floor |
| 10/8/2019 8:16:40 AM | Shopper | 65.206.95.146 | zip | 11788 | 10004 |
| 10/7/2019 3:35:40 PM | Shopper | 172.58.200.165 | mobilePhone | | +1.3476453001 |
| 10/24/2017 4:21:46 PM | Shopper | 71.183.222.66 | city | | hauppauge |
| 10/24/2017 4:21:46 PM | Shopper | 71.183.222.66 | country | | US |
| 10/24/2017 4:21:46 PM | Shopper | 71.183.222.66 | first_name | | brian |
| 10/24/2017 4:21:46 PM | Shopper | 71.183.222.66 | last_name | | martinsen |
| 10/24/2017 4:21:46 PM | Shopper | 71.183.222.66 | phone1 | | +1.6318389570 |
| 10/24/2017 4:21:46 PM | Shopper | 71.183.222.66 | state | | NY |
| 10/24/2017 4:21:46 PM | Shopper | 71.183.222.66 | street1 | | 14 stanley pl. |
| 10/24/2017 4:21:46 PM | Shopper | 71.183.222.66 | zip | | 11788 |

# EXHIBIT D

A. It was an initial interview basically to get an understanding of how the firm operated, what type of business it was conducting.

Q. Did you ask Mr. Castillero and Mr. Lachow any questions about StraightPath during that meeting?

A. Yes, I did.

Q. What did you ask them?

A. Basically how the business is run, how the business is structured. I asked about the funds, how they operate, also how the funds obtain shares in the private companies, how investor money is handled, basically a general overview.

Q. Let's take some of those questions one at a time.

How did they explain to you how StraightPath was structured?

A. So StraightPath Management was an exempt reporting adviser.

Q. What's an exempt reporting adviser?

A. An exempt reporting adviser is a financial company that's not registered with the Commission. However, based upon their business, they're required to make filings with the Commission through -- these filings through Form ADV.

Q. Separate from StraightPath Management, what else did they tell you about how the business was structured?

A. So StraightPath Management was the adviser to the funds. There was also another entity, StraightPath Venture Partners. This entity was not registered with the Commission also, and

that entity acted as a general partner or manager over the funds.
Q. How many funds did StraightPath have at that time?
A. Two funds.
Q. Did you ask about who the employees of StraightPath were?
A. Yes, I did. And I was informed that there was only two employees, Mr. Lachow and Mr. Castillero.
Q. So Mr. Lachow, Mr. Castillero told you the only two employees of StraightPath were the two of them?
A. Yes.
Q. What did they say their roles were with StraightPath?
A. Mr. Castillero stated that Mr. Lachow was managing -- was the manager of StraightPath management. He was like the fund manager, so he was operating StraightPath management and the funds, as well as obtaining shares in the private company.
Q. What was Mr. Castillero's role?
A. Mr. Castillero stated that he dealt more with the investor side, in terms of reviewing subscription agreement, ensuring that investors met the requirements who invest in the fund, to verify their net worth and things like that. He and Mr. Lachow also handled obtaining referral agents for the fund.
Q. Did they say who the owner of StraightPath was?
A. Yes, Mr. Castillero said he was the owner.
Q. Did Mr. Castillero or Mr. Lachow say who was finding the Pre-IPO shares that StraightPath was selling?

investigation after you made the referral?
A. No.
Q. I'd like to show you some documents that you mentioned during your testimony. Let's start with Government Exhibit 13.
What is Government Exhibit 13, Mr. Debella?
A. It's a Form ADV that's been filed by StraightPath Management on March 27, 2018.
Q. Is this the date up here that I'm circling that it was filed?
A. Yes.
Q. Is this similar to one of the documents you would have reviewed during that preliminary background check that you talked about?
A. It's similar, yes.
Q. What entity is this Form ADV for?
A. It's for StraightPath Management, the exempt reporting adviser.
Q. And if we turn to page three of this document. Who's listed as the chief compliance officer of StraightPath Management?
THE COURT: Counsel, is this in evidence?
MR. SHAHABIAN: Apologies, your Honor. I thought it was in evidence. The government offers Government Exhibit 13.
THE COURT: Any objection? Admitted.
(Government's Exhibit 13 received in evidence)

THE COURT: Maybe we could go back to the first page now that it's published.

Q. Now that it's in evidence -- and apologies for that, your Honor -- what's the first page of Government Exhibit 13, Mr. Debella?

A. It's a Form ADV that was filed by StraightPath Management as exempt reporting adviser.

Q. Is this a public document?

A. Yes.

Q. If we turn to page three.

Who's listed as the chief compliance officer for StraightPath management?

A. Mr. Eric Lachow.

Q. And do you see Box K, additional regulatory contact person?

A. Yes.

Q. What's the purpose of this box?

A. Purpose is if there's a question on the form, this is the person to contact.

Q. And who's listed there?

A. Ms. Lanaia.

Q. Is this the information you saw about Ms. Lanaia that caused you concern when you first did your background investigation?

A. Yes.

Q. Let's turn to page 23.

Partners.

Q. What's the difference between the examination you did of StraightPath Management and your voluntary request for StraightPath Venture Partners?

A. Since StraightPath Management is an exempt reporting adviser, while they're not registered with the Commission, they're required to maintain certain books and records. And I have the right to review those books and records, so it's a more formal situation with StraightPath Management.

StraightPath Venture Partners is an unregistered entity; and therefore, I can only request the information. The firm does not have to provide it. It's more of an informal inquiry.

Q. Why were you making a voluntary request to StraightPath Venture Partners?

A. During the first interview, I was told that StraightPath Venture Partners was the entity paying all the business expenses, as well as paying selling agents and finders' commissions.

Q. Return to Government Exhibit 404. Don't publish this yet. This is just for the Court, the parties and the witness.

Do you recognize this, Mr. Debella?

A. Yes.

Q. What is it?

A. It's a response from StraightPath Venture Partners --

continued to make follow-up demands of StraightPath for additional documents; correct?
A. Yes.
MR. KEATING: If we could have Government Exhibit 1318, please. It's in evidence.
Q. And 1318, am I correct, begins with an email from you to elachow@straightpath with two attachments, one is to StraightPath Venture Partners and the other is to StraightPath Management; correct?
A. Yes.
Q. And concerning StraightPath Management, you made a demand in this document for some follow up records; correct?
A. Yes.
Q. Concerning StraightPath Venture Partners, this was, am I correct, your first request of materials from that entity; correct?
A. That is correct.
Q. And this is known as a voluntary request; correct?
A. Yes.
MR. KEATING: If we could go to page five of that document, please.
At the bottom of the page, please.
I've highlighted a section, your Honor. It will be removed when it goes into evidence, I just want to direct the witness's attention.

Q. A voluntary request, would you agree with me, sir, means that StraightPath Venture Partners was under no obligation to comply; correct?
A. That's correct, yes.
Q. And in fact, does it say on this form in the highlighted section: There are no direct sanctions and, thus, no direct effects for failure to provide all or any part of the information requested to be supplied on a voluntary basis.
Did I read [redacted]
A. Yes, you did.
Q. And does that mean that if StraightPath Venture Partners said to you, we're not complying, there's not a thing you can do to StraightPath Venture Partners?
A. Correct.
MR. KEATING: If we can have Government Exhibit 404, please. It's in evidence.
Q. Government Exhibit 404 is a letter, dated March 18, to you from StraightPath; correct, sir?
A. Yes.
Q. And this is part of the follow-up requests that you have made and the responses being provided to you by StraightPath; correct?
A. Correct, yes.
Q. And this concerns StraightPath Management; correct?
A. Yes.

M. Castillaro
5612 SW PEACH PALM PL
PALM CITY, FL 34990

7022 0410 0001 8348 3724

Retail

UNITED STATES POSTAL SERVICE®

10007

RDC 99

U.S. POSTAGE
FCM LG ENV
STATEN ISLAND
JUL 14, 2026

$15.44

S2324E500187-

USM
SDNY

THE CHIEF JUSTICE OF THE
SOUTHERN DISTRICT OF NEW YORK

Hon. Laura Taylor Swain
Daniel Patrick Moynihan U.S. Courthouse
500 PEARL STREET, Room 2540
New York, NY 10007-1312

2026 JUL 16 PM 4: 12

7022 0410 0001 8348 3724

Retail

UNITED STATES POSTAL SERVICE®

RDC 99

10007

U.S. POSTAGE PAID
FCM LG ENV
STATEN ISLAND, NY 10307
JUL 14, 2026

$15.44

S2324E500187-7

RECEIVED
SDNY PRO SE OFFICE
2026 JUL 16 PM 4: 12

THE CHIEF JUSTICE OF THE
SOUTHERN DISTRICT OF NEW YORK

Hon. Laura Taylor Swain
Daniel Patrick Moynihan U.S. Courthouse
500 PEARL STREET, ROOM 2540
New York, NY 10007-1312